[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 478 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 479 
In December 1999, the State filed a petition to terminate respondent mother's parental rights, pursuant to the Adoption Act (Act) (750 ILCS 50/1et seq. (West 1998)). The petition, as amended in May 2000, alleged six separate grounds for a finding of unfitness: (1) substantial neglect of the children that was continuous or repeated (750 ILCS 50/1(D)(d) (West Supp. 1999)); (2) other neglect of, or misconduct toward the children (750 ILCS 50/1(D)(h) (West Supp. 1999)); (3) inability to discharge parental responsibilities (750 ILCS 50/1(D)(p) (West Supp. 1999)); (4) failure to make reasonable efforts to correct the conditions that were the basis for the removal of the children (750 ILCS 50/1(D)(m)(i) (West Supp. 1999)); (5) failure to make reasonable progress toward the return of the children within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West Supp. 1999)); and (6) failure to make reasonable progress toward the return of the children during any nine-month period after the end of the initial nine-month period following the adjudication of neglect *Page 481 
(750 ILCS 50/1(D)(m)(iii) (West Supp. 1999)). Following a fitness hearing in May 2000, the trial court found respondent unfit under the first, second, fourth, and sixth grounds alleged. A dispositional hearing was held and the trial court found it to be in the children's best interest to terminate respondent's parental rights. She appealed.
The appellate court reversed in part, vacated in part, and remanded the matter to the trial court for further proceedings. Specifically, the appellate court held that the trial court's finding regarding the first ground, substantial neglect (750 ILCS 50/1(D)(d) (West Supp. 1999)), was against the manifest weight of the evidence. 321 Ill. App. 3d 211, 221. As to the second ground, "[o]ther neglect of, or misconduct toward" the children (750 ILCS 50/1(D)(h) (West Supp. 1999)), the appellate court reversed the trial court's ruling on the basis that section 1(D)(h) is unconstitutionally vague. 321 Ill. App. 3d at 223. Finally, as to the fourth and sixth grounds, the appellate court vacated the judgment of the trial court on the basis that the trial court considered evidence of events occurring outside the applicable time periods.321 Ill. App. 3d at 223.
Respondent also argued on appeal that the trial court erred by denying her motion for substitution of judge for cause pursuant to section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 1998)). The appellate court rejected this argument, finding that respondent's motion was premature because it was filed prior to the filing of the State's motion to terminate parental rights, which "initiated an entirely new proceeding." 321 Ill. App. 3d at 224. The appellate court further stated, in dicta, that if the motion had been identified as a motion to substitute judge as of right (735 ILCS 5/2-1001(a)(2) (West 1998)) and filed promptly after the filing of the termination petition, it would have been error for the trial court to deny it. 321 Ill. App. 3d at 224. *Page 482 
We granted the State's petition for leave to appeal pursuant to Supreme Court Rule 315 (177 Ill. 2d R. 315(a)).
 BACKGROUND
Respondent is the mother of three daughters, E.K. (born September 16, 1987), T.K. (born November 30, 1991), and D.F. (born February 13, 1997). In December 1997, the State filed a petition for adjudication of wardship, alleging that the girls were neglected, pursuant to section 2-3(1) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1) (West 1996)). In April 1998, respondent admitted and stipulated to the State's allegations that the children were not receiving proper or necessary support or other care necessary for their well-being (705 ILCS 405/2-3(1)(a) (West 1996)), based on the unsanitary condition of the home. The State agreed to the dismissal of a separate allegation that D.F. was living in an environment injurious to her welfare (705 ILCS 405/2-3(1)(b) (West 1996)), based on the diagnosis of "nonorganic failure to thrive" syndrome. The girls were adjudicated neglected minors and made wards of the court. D.F. continued to reside with respondent and her husband, Chris F., while E.K. and T.K. spent an extended period of visitation in Wisconsin with their father, John K., and his wife, Karen K. Later, the Department of Children and Family Services (DCFS) was appointed guardian and placed the two older girls with their father. The baby, D.F., who is a half sister to the older girls, was placed with foster parents.
On September 17, 1999, following a permanency hearing, the trial court entered a permanency order setting the goal for E.K. and T.K. as remaining in their father's home and for D.F., as substitute care pending a court determination on a petition to terminate parental rights. On that same date, respondent filed a motion for substitution of judge for cause, pursuant to section *Page 483 
2-1001(a) of the Code of Civil Procedure (735 ILCS 5/2-1001(a) (West 1998)). A hearing was held on November 1, 1999, before a different judge. Counsel for respondent argued that certain comments made by the original judge evinced bias or prejudice against the respondent parents. The State argued that the judge's comments related to the credibility of witnesses, including the respondent parents, and were therefore appropriate. Counsel for DCFS pointed out that at the same hearing in which the judge made the disputed comments, he also made comments that were favorable to the respondent parents. The guardian ad litem opposed the motion. The motion for substitution of judge for cause was denied.
In December 1999, the State filed a petition to terminate respondent's parental rights as to all three children. (The petition also sought to terminate the parental rights of D.F.'s father. He is not a part of the present appeal. See In re D.F., 317 Ill. App. 3d 461 (2000).) After conducting the required hearings into the fitness of respondent and the best interests of the children, the trial court terminated her parental rights, placing full legal and physical custody of E.K. and T.K. with their father and also giving him the authority to consent to their adoption by their stepmother. The trial court also terminated respondent's rights with respect to D.F., appointing DCFS as her guardian, with the power to consent to adoption. Because the issues in this case relate only to the trial court's finding of unfitness, we limit our summary of the testimony to that adduced at the fitness portion of the termination proceedings.
Child protective investigator Mike Mucci testified that he visited respondent's home in September 1995 in response to a hot-line report of environmental neglect. The home was extremely cluttered, with the floors and flat surfaces such as chairs and countertops piled with *Page 484 
clothing and other items. A litter box in the bathroom was overflowing with cat feces and there were cat feces throughout the house. Three cats and three kittens were present. The electricity had been turned off and the food in the refrigerator was spoiled. The house smelled strongly of spoiled food and cat urine and feces. E.K. was seven years old at the time and T.K. was four. As a result of this investigation, respondent was indicated for environmental neglect and services were offered. The household also included respondent's second husband, Robert Riley, whom she accused of domestic violence. Mucci subsequently learned that Riley was a sex offender and he informed respondent of this fact. The children were interviewed and given physical examinations. E.K. reported that she had seen Riley touch her sister in the vaginal area. Riley was indicated for risk of sexual harm and respondent was advised to allow her children to have no further contact with him.
Betty Schapmire, another DCFS investigator, received a hot-line report of environmental neglect in November 1997. She visited respondent's home and found respondent living with her new husband, Chris F.; their infant daughter, D.F.; her two daughters, E.K. and T.K.; and an adult roommate in a two-bedroom apartment. The apartment was very cluttered, particularly in the bedrooms and the kitchen. A cat litter box in the hallway was "filled to the top" with feces and overflowing onto the floor. The odor of cat feces was "heavy" and noticeable when she entered the door to the apartment. The bedroom floors were covered with clothing to the point that the doors could not be fully opened. The floor in the girls' bedroom was not visible due to the clutter. Dishes were stacked on the kitchen counters and bits of food were scattered on the kitchen floor. Schapmire filed an indicated report on the basis of environmental neglect and referred the family for services. *Page 485 
Schapmire also noticed during the visit that D.F. was quite small for her age. When questioned, respondent and her husband were unconcerned about D.F.'s size or weight. Schapmire arranged for a medical examination and the doctor diagnosed D.F. with nonorganic failure to thrive syndrome. Schapmire made an indicated report to that effect as well. It was this second indicated report that precipitated the filing of a petition for wardship.
Schapmire stated that she checked DCFS records prior to her initial visit to respondent's apartment and was aware of the prior indicated reports for environmental neglect and risk of sexual abuse. However, when she asked respondent and her husband about prior involvement with DCFS, they denied any prior contacts. She also learned from the DCFS records that there had been a contact in 1994, prior to Mucci's investigation. Respondent was informed at that time that her then-husband, Riley, was a sex offender. Thus, she had already been aware of Riley's status as a sex offender when Mucci informed her of that fact following his 1995 investigation, but had continued to give Riley access to her daughters.
DCFS caseworker Theresa Kelly testified that she had been assigned to respondent's case since late 1997. Schapmire had referred this case to Family First for intensive services, first to deal with the cleanliness issue and later to address D.F.'s failure to thrive. One of Kelly's duties was to monitor the effectiveness of the services provided by Family First. Initially, T.K. was thin, her hair was dull, and she had poor hygiene and body odor. E.K. was combative and argumentative. She yelled and swore at the Family First workers. Kelly stated that E.K. had become "parentified," that is, the adults in the household had placed adult expectations on her and she responded by attempting to perform parental functions. For example, she would answer the door when social *Page 486 
services personnel arrived, and would lie to the workers, telling them that her mother was not at home. E.K. was also failing in school. D.F. had been diagnosed with nonorganic failure to thrive, indicating problems with feeding and bonding. Respondent was in the habit of feeding the baby in her walker, which is not conducive to either weight gain or bonding. She made some progress in this area and D.F. slowly began to gain weight. Kelly also testified that respondent was frequently dishonest with the service providers and that the time needed to get to the truth took away from providing services. The family moved frequently. At the time Kelly became involved, an adult roommate named Kevin was also living with respondent, her husband, and the three children.
In early 1998, during a visit, John K. took the two older girls to the dentist because T.K. was complaining of a toothache. The dentist discovered four deep holes in her molars, including one that was abscessed and one that was very close to being abscessed. He recommended a dental procedure that would have required treatment on two separate days. DCFS asked respondent to allow the children to remain in Wisconsin for the additional time needed to complete the dental work. They were on spring break at the time and it would not have disrupted school attendance. Respondent, however, obtained an emergency order of protection in Du Page County (where her divorce from John had been entered) and utilized the services of the sheriff's department in Wisconsin to remove the children. Respondent later explained to Kelly that she had intended to take T.K. to a dentist, but admitted that she had not tried to make an appointment and could not afford to pay for dental care in any event. The needed dental work was eventually completed on a subsequent visit to Wisconsin.
Kelly further explained that the initial plan developed for the family called for the children to remain in the *Page 487 
home. Specific goals included maintaining an adequate environment; getting rid of the cats that were the source of much of the filth; following the doctor's recommendations regarding feeding of the infant; obtaining routine medical care such as immunizations; obtaining steady employment or benefits sufficient to meet basic needs; and refraining from negative comments about John and Karen K. In April 1998, respondent and her husband were rated "satisfactory" on their progress under the initial plan, but the Family First personnel commented that they "had just minimally made the minimal parenting standards." In addition, Family First expressed grave concerns about the family's economic and housing situations remaining stable.
At the August 1998 case review, respondent and her husband were rated "unsatisfactory" on every goal except cooperation with Services for Parent Infant Child Education (SPICE) by participating in therapy for the developmental delay that resulted from D.F.'s failure to thrive. Unmet goals included maintaining employment, maintaining stable and suitable housing, cooperating with the home interventionist, attending counseling on a regular basis, and adhering to court orders.
Kelly also testified regarding an incident that occurred in July 1998, when E.K. and T.K. returned from a visit with John and Karen K. Kelly was present at the "hand off" between John and respondent. The girls appeared clean and healthy. They were tan and their hair was shiny. T.K. had gained some weight and lost her "waif-like appearance." Respondent and the children left as Kelly was talking to John and Karen about the summer visit. Kelly asked about a bruise she had noticed on T.K.'s thigh and Karen explained that her leg had been pinched by the restraining bar of a carnival ride several days before. Respondent then reappeared, "visibly agitated," and insisted that T.K. show Kelly the bruise *Page 488 
on her thigh and a smaller bruise on her arm. Kelly stated that she was aware of the bruises and that Karen had already explained the cause. T.K. smiled and nodded in agreement when Kelly mentioned the carnival ride. Respondent, however, insisted that T.K. had been abused. Despite Kelly's suggestion that it was a violation of a court order to have such a discussion in front of the children, respondent persisted.
Respondent subsequently contacted the caseworker in Wisconsin to inform her of the alleged abuse. She told the Wisconsin caseworker, falsely, that Kelly had been reprimanded and taken off this case. Respondent also took T.K. to a hospital emergency room to have the bruise examined. Kelly then insisted that the girls be brought to her office for an interview regarding the alleged abuse. When they arrived, they smelled of urine, feces, and body odor. Their skin was ashen and their hair was dull. The interview took place within a week of their return from Wisconsin. During the interview, E.K. said that her mother left her at a friend's house rather than take her along to the emergency room because E.K. would have told the doctor the truth. T.K. admitted telling the doctor that Karen hit her with a wooden spoon but also admitted that this was a lie. She lied to the doctor because her mother and her grandparents promised her "lots of fun things" and a swimming pool.
Kelly also testified about difficulties with telephone contacts between the girls and their father. Respondent would not allow the girls to talk to their father, telling them that it was against a court order for them to do so. By this time, in August 1998, respondent had taken in another cat. D.F. was beginning to gain weight, but she was still thin and her hair was dull. Respondent indicated to Kelly that she thought the baby was gaining too much weight and that the pediatrician agreed with her. However, when Kelly contacted the doctor, she learned *Page 489 
that the doctor was pleased with the baby's weight gain and advised that it should continue. Rather than being below the lowest percentile on the growth charts, D.F. had reached the twenty-fifth percentile for her age.
Dr. Marty Traver, a licensed clinical psychologist, testified that she evaluated respondent for DCFS on two occasions, in November 1998 and December 1999. In 1998, Traver found respondent to have average intelligence and appropriate affect, but "no insight into her situation with DCFS." For example, she did not accept the diagnosis of failure to thrive regarding D.F., and she did not agree that unsanitary conditions in her home were a serious concern.
Respondent made several statements to Traver that were "not congruent with the report" provided by DCFS. Respondent told Traver that she first became involved with DCFS in September 1997. The case history, however, showed involvement as far back as 1994. Respondent did not acknowledge unsanitary conditions in her home, admitting only to the "normal amount of dirty dishes." Respondent also believed that her youngest child was merely small for her age and that the caseworker persuaded the doctor to diagnose failure to thrive.
Traver administered various personality and psychological tests. Respondent produced an invalid profile in several tests by giving answers designed to present herself in a unrealistically positive light. Her answers showed "significant resistance" to the tests and were "highly defensive." Traver concluded that respondent's strengths included her intellectual functioning and her love for her children. On the other hand, she did not exhibit empathy. She failed to maintain stability in employment, housing, or relationships. Despite evidence of unhygienic conditions and the children's unmet need for dental care, respondent "did not understand concerns about her parenting" and "appeared to blame others for *Page 490 
her situation." With regard to respondent's untruthfulness, Traver found that respondent "often impulsively makes up responses" when she wants to present herself in a positive light and that she may be "somewhat delusional" in that "her denial system is very strong." In response to DCFS's inquiry about respondent's compliance with court orders, Traver stated that respondent would be unlikely to comply if an order did not "make emotional sense to her." She has a "sense of entitlement and tries to manipulate situations."
Traver diagnosed a personality disorder with histrionic, narcissistic, and passive-aggressive features. She concluded that respondent had the intelligence needed to meet minimum parenting standards. However, respondent's defensiveness and failure to acknowledge her problems made it unlikely that she would be motivated to comply. Traver recommended both individual and marital therapy.
Traver evaluated respondent again in 1999 and found that she continued to have poor insight into her situation. Traver administered another battery of tests, in part because DCFS had again expressed concern that respondent's level of mental functioning was low. Traver found that respondent's intellectual functioning was average but that she lacked empathy for others and showed narcissistic traits. Respondent still did not understand why D.F. had been removed from her custody. Traver described her as living "partly in a fantasy world and partly in reality." She had made no progress as far as understanding her parenting deficiencies. Because her denial system was so strong, respondent was at risk for relapsing into unsanitary living conditions. Traver recommended further counseling.
Holly Hardin, a clinical psychologist, counseled respondent from February 1999 to August 1999. During that time, respondent attended 13 of 20 scheduled sessions *Page 491 
and did not complete several "homework" assignments. Hardin testified that, overall, respondent did not make satisfactory progress. After a great deal of discussion, respondent finally acknowledged that there was "some value" in dental care for the children. She continued to believe that John K.'s efforts to obtain dental care while the children were visiting him was merely a ploy to increase the length of the visits. Respondent also resisted taking any responsibility for the infant's failure to thrive. She insisted that she had been worried about the baby gaining too much weight and that the pediatrician had placed the baby on a "diet." Respondent tended to blame others, particularly John K., for all of her difficulties. Respondent did acknowledge her habit of lying or exaggerating and seemed to recognize that it affected her parenting ability. However, respondent did not do the assigned homework or practice alternative behaviors that could have led to progress on this point. Respondent did begin to understand that her impulsiveness contributed to her frequent job changes, her nomadic lifestyle, and other factors that were disruptive in the household, but she did not make any progress changing this behavior. Hardin's most "generous" evaluation was that, although respondent had begun to understand some issues, she had not made sufficient progress for "true change" to have occurred. The prognosis for change was "very poor," because respondent was unwilling or unable to change.
Court-appointed special advocate Shannon Perkins testified that she was assigned to respondent's case from April 1999 to May 2000. Her primary role became one of attempting to verify whether the information provided by respondent about her housing and employment situations was true. Respondent had five different employers during the 13-month period. In each case, the explanation given by the employer for respondent's termination *Page 492 
differed from respondent's story. Perkins believed that respondent tried to meet the goals of the client service plan, but that "when things got too much" for her, she "quit and put the blame on somebody else." In addition, respondent was "unwilling to take advantage" of the services offered to help her get D.F. back.
Respondent testified that she had been married to John K. from 1985 to 1993. Upon their divorce, they were awarded joint custody of E.K. and T.K. She was granted physical custody. She and John had no contact from 1993 to July 1997. During that time she moved seven times, twice out of state, and changed her name twice due to remarriage. She acknowledged that she failed to inform the court that had jurisdiction over the custody and support of E.K. and T.K. of her many address changes. She denied, however, that she intentionally kept the children from John and stated that she kept in touch with his parents and that he could have reached her at any time by contacting her mother. She also denied using E.K.'s name and social security number to obtain telephone services in 1994, when the child was six or seven years old. Respondent stated that she had never seen the proffered credit report listing an outstanding telephone bill in E.K.'s name for services to an address in Streator, Illinois, at which she admitted living in 1994. Respondent apparently had at least eight different jobs and moved several more times during the pendency of this case. She continued to minimize the significance of the failure to thrive diagnosis, claiming that D.F. "never lost weight" while in her care, she just gained weight "slowly." Respondent stated that D.F.'s sudden increase in weight once she was in a foster home must have been due to her moving from formula and baby food to solid food. Finally, respondent remains convinced that at least some of the DCFS personnel involved in this case were personal friends of John and Karen K. and were trying *Page 493 
to make sure that she lost her children. She testified to her belief that T.K. was coerced into recanting her accusation of abuse by Karen.
In the end, however, respondent stated that she believed it was in the best interests of E.K. and T.K. to remain with their father in Wisconsin, but that her parental rights should not be terminated. She also believed that if D.F. could not be returned to her, custody of D.F. should be given to her husband's mother and stepfather, who live in North Carolina.
Karen K. testified that she and John made many attempts between 1994 and 1997 to locate E.K. and T.K. He called respondent's mother, who told him that she did not know where the respondent was. Karen even wrote to a television talk show in the hope of obtaining publicity that would lead to their finding the girls. Finally, in 1997, Karen obtained respondent's phone number by having a friend pose as a high school classmate of respondent and call her mother, pretending to be looking for respondent for a high school reunion. Karen also testified that T.K. admitted to her that she lied about the source of her bruise because her mother and grandparents promised her camping trips and a swimming pool.
Following arguments by counsel and the guardian ad litem, the court issued its ruling. After summarizing the history of this case in detail, the court commented on D.F.'s failure to thrive, observing that although D.F. "did a little better" in respondent's care after Family First became involved, the baby "prospered once not in her care." In addition, respondent and her husband, "after months and months of work, really hadn't resolved the issues in this case and, indeed, created new issues and new concerns." The court then commented on respondent's history of lying. The court noted that the lies were not limited to "white lies," like claiming to have quit a job rather than having been fired to make herself look *Page 494 
better in the eyes of another. Specifically, the court found that respondent was not telling the truth about John's inability to see E.K. and T.K. from 1993 to 1997. "[I]n fact," the court stated, "she withheld or secreted her children from their father during that period." The court also concluded that respondent lied about "the bruise situation" and "put her child up to making a false statement." Withholding the older children from their father "for a period of years is a serious act of neglect." Having a child falsely accuse Karen of hitting her was an "extremely serious substantial act of neglect or misconduct toward a child." In addition, "environmental matters on several occasions were serious." In sum, the court found "substantial neglect over a period of years," under section 1(D)(d) of the Act, based on four factors: environmental matters, D.F.'s failure to thrive, withholding E.K. and T.K. from their father, and the "bruise situation." The court found three additional grounds for unfitness proven, and two of the asserted grounds unproven.
On appeal, the appellate court held that the trial court's finding of unfitness pursuant to section 1(D)(d) was against the manifest weight of the evidence. 321 Ill. App. 3d at 221. However, before reaching this conclusion, the appellate court interpreted section 1(D)(d), "substantial neglect of the child if continuous or repeated" (750 ILCS 50/1(D)(d) (West 1998)), as requiring acts of neglect "so severe that giving the offending parent an opportunity to remediate them would be unconscionable."321 Ill. App. 3d at 220.
 ANALYSIS
The involuntary termination of parental rights upon the petition of the State is governed by the Juvenile Court Act of 1987 (705 ILCS 405/1 etseq. (West 1998)), and the Adoption Act (750 ILCS 50/1 et seq. (West 1998)). A two-step process is mandated. First, the State must show, by clear and convincing evidence, that the parent *Page 495 
is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 1998)). In re D.D., 196 Ill. 2d 405, 417 (2001). If properly proven, any one of the several grounds that are enumerated in section 1(D) is sufficient for a finding of unfitness. See 750 ILCS 50/1(D) (West 1998) (providing that a finding of unfitness may be based on "any one or more" of the enumerated grounds). If the court makes such a finding, it will then consider whether it is in the best interests of the child that parental rights be terminated. See 705 ILCS 405/2-29(2) (West 1998); In re C.N., 196 Ill. 2d 181, 209 (2001).
When the respondent parent challenges the sufficiency of the evidence, a reviewing court will reverse a trial court's finding of unfitness only where it is against the manifest weight of the evidence. D.D.,196 Ill. 2d at 417. If, however, the question presented is one of statutory construction, we will review it de novo. D.D.,196 Ill. 2d at 418. We, therefore, address the first question discussed by the appellate court — the interpretation of section 1(D)(d) — denovo.
 Substantial Neglect
Section 1(D)(d) provides that a person may be declared an unfit parent upon proof of "[s]ubstantial neglect of the child if continuous or repeated." 750 ILCS 50/1(D)(d) (West Supp. 1999). The Act does not define the terms "substantial" or "neglect," but does contain a definition of "neglected child":
 "any child whose parent or other person responsible for the child's welfare withholds or denies nourishment or medically indicated treatment * * * or otherwise does not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a child's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter; or who is abandoned by his or her parents or other person responsible for the child's welfare." 750 ILCS 50/1(Q) (West 1998). *Page 496 
This definition provides a baseline for a finding of neglect, but does not distinguish neglect from substantial neglect. In the absence of a statutory definition indicating legislative intent, an undefined word must be given its ordinary and popularly understood meaning. C.N., 196 Ill. 2d at 211. Webster's defines "substantial" as "consisting of, relating to, sharing the nature of, or constituting substance" and as "considerable in amount, value, or worth." Webster's Third New International Dictionary 2280 (1986). Synonyms include "consequential," "considerable," "material," "meaningful," "momentous," "significant," and "weighty."
As an initial matter, we agree with the appellate court that the legislature's use of the term "substantial neglect" in section 1(D)(d) evidences a recognition that there are degrees of parental neglect, ranging from "neglect" to "substantial neglect." While neglect may justify state intervention (see, e.g.,705 ILCS 405/2-3(1) (West 1998)), substantial neglect, if continuous or repeated, is grounds for the outright termination of parental rights (750 ILCS 50/1(D)(d) (West 1998)).
In its effort to further clarify the meaning of "substantial neglect," the appellate court contrasted section 1(D)(d), under which a parent's rights may be terminated outright, with certain provisions of the Juvenile Court Act under which "the parent responsible for the neglect is given an opportunity to remediate the circumstances that gave rise to the neglect finding."321 Ill. App. 3d at 220. On the basis of this comparison, the appellate court concluded that the legislature's use of the modifier "substantial" in section 1(D)(d) "manifests the legislature's belief that some cases of neglect are so heinous that a child's best interest can only be served by severance of parental rights without giving the parent the chance to remediate." 321 Ill. App. 3d at 220. Undoubtedly, such cases do involve substantial neglect. However, *Page 497 
the appellate court then extended this reasoning even further by concluding that "when the State alleges unfitness under section 1(D)(d) of the Act, the instances of `substantial neglect' should be such that remediation would not be an appropriate option."321 Ill. App. 3d at 220. No authority was cited for this conclusion, which impermissibly reads into the statute a limitation that the legislature did not express. See In re D.L., 191 Ill. 2d 1, 9 (2000).
Although the appellate court has formulated one possible test of "substantial neglect," it is by no means the only possible standard. For example, substantial neglect could be distinguished from neglect on the basis of harm — neglect poses a risk of harm, while substantial neglect causes actual harm or, perhaps, permanent harm. The legislature could have defined substantial neglect in any one of a number of ways, but has chosen not to do so. Instead, the legislature has apparently intended for a trial court to apply the ordinary meaning of the term "substantial" to the entire body of evidence before it. Thus, whether remediation was or might have been attempted and whether actual harm resulted from the neglect are factors to be considered when assessing the degree of neglect. Neither is a limitation or condition that constrains the trial court's judgment.
The appellate court's rigid definition of substantial neglect also ignores the wide range of factual circumstances in which these cases arise. For example, the State might proceed initially by giving a parent the opportunity to remediate but discover as the case goes on that the neglect has been so extreme, or the consequences so grave, that it constitutes substantial neglect. In another case, the State might recognize substantial neglect initially, but provide remedial services to the parent because the neglect, while substantial, has not yet been repeated or continuous. See D.D., 196 Ill. 2d at 422 (noting *Page 498 
that in cases involving termination of parental rights, each case is sui generis).
We must conclude that the legislature intended for the trial court to determine whether neglect in a given case, proven by clear and convincing evidence (D.D.,196 Ill. 2d at 417) and based on the totality of circumstances, is substantial. We note that trial courts are not unfamiliar with the concept of substantiality. A glance at Black's Law Dictionary reveals, among other entries, the substantial-capacity and substantial-step tests in criminal law, the substantial-certainty test and the substantial similarity-standard in copyright law, the substantial-continuity doctrine in corporate law, the substantial-factor test in tort law, and the doctrine of substantial performance in the law of contracts. Black's Law Dictionary 1442-43 (7th ed. 1999). The adjective "substantial" is not in need of precise and inflexible definition. Substantial neglect is a matter of degree, and one which the trial court, as the finder of fact, is in the best position to assess.
We find, therefore, that the appellate court's unduly restrictive definition of the statutory term "substantial neglect" is in error. There being no need for the creation of a bright-line rule to divide neglect from substantial neglect, the proper role of a reviewing court in this case is to determine whether the trial court's finding of unfitness was against the manifest weight of the evidence. C.N., 196 Ill. 2d at 208. A determination will be found to be against the manifest weight of the evidence only if the opposite conclusion is clearly evident (C.N., 196 Ill. 2d at 208) or the determination is unreasonable, arbitrary, or not based on the evidence presented (Leonardi v. Loyola Universityof Chicago, 168 Ill. 2d 83, 106 (1995)). Under a manifest weight of the evidence standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor *Page 499 
of the parties and the witnesses and has a degree of familiarity with the evidence that a reviewing court cannot possibly obtain. A reviewing court, therefore, must not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. In re A.P., 179 Ill. 2d 184, 204 (1997).
The trial court, in its comments from the bench, stated that its finding of substantial neglect was based on four factors: (1) the unsanitary conditions in respondent's home, (2) D.F.'s failure to thrive, (3) respondent's withholding E.K. and T.K. from their father for several years, and (4) respondent's manipulation of T.K. into making false accusations of physical abuse against Karen K. The implication was that even if no single one of these, standing alone, constituted substantial neglect, the cumulative effect of all four was substantial and affected all three children.
Neglect may take many forms. The statutory definition of a neglected child mentions, inter alia, lack of proper nourishment, denial of needed medical care, lack of education, failure to provide adequate clothing and shelter, and abandonment. 750 ILCS 50/1(Q) (West 1998). Section 1(D)(d) does not require that one single form of neglect be proven to be substantial. We agree with the trial court that substantial neglect may result from the cumulative effect of several forms of neglect. As this court observed many years ago, "[n]eglect * * * is the failure to exercise the care that the circumstances justly demand. It embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes."People ex rel. Wallace v. Labrenz, 411 Ill. 618, 624
(1952).
Respondent argues, however, that of the four bases *Page 500 
relied on by the trial court, only the second, failure to thrive, was relevant to D.F. The first reported instance of environmental neglect occurred prior to her birth, so that her exposure to unsanitary conditions in the home was neither continuous nor repeated. She also asserts that the third and fourth bases relate only to the older girls. Similarly, she argues that D.F.'s failure to thrive cannot be considered a factor in assessing the degree of neglect of T.K. and E.K.
D.F.'s situation differed from that of her half sisters in several respects. She alone was diagnosed with nonorganic failure to thrive syndrome and was in need of SPICE services to overcome her developmental delay. She was too young to have been directly affected by respondent's habit of lying and of inducing her children to lie on her behalf.
This court has never had occasion to consider whether evidence supporting a finding of unfitness as to one of a parent's children may serve as a basis for a finding of unfitness as to another child. We agree with the numerous appellate court decisions that have concluded that such evidence may be relevant. See In re G.V.,292 Ill. App. 3d 301, 307 (1997) (evidence that respondent failed to protect child who was killed by her paramour could serve as basis for termination of parental rights to other child); In re S.H., 284 Ill. App. 3d 392,400-01 (1996) (evidence of respondent's sexual abuse of one child may serve as basis for terminating of parental rights to other children, even when the evidence relates to events that occurred prior to the birth of some of the children); In re Henry, 175 Ill. App. 3d 778,792 (1988) (even though two of the respondent mother's eight children were born after she had been found unfit with regard to older children, the trial court properly considered her earlier neglect as a basis for finding her unfit with regard to the infants). We conclude that depending on the type of neglect alleged, *Page 501 
evidence of neglect toward one child may be relevant to the question of a parent's fitness with respect to another child.
In the present case, E.K. and T.K. lived in extremely unsanitary conditions, twice resulting in DCFS intervention. The testimony regarding filthy floors, spoiled food, and cat feces throughout the home on two separate occasions, several years apart, supports a finding that the environmental neglect was not only severe, but was, at best, repeated, and at worst, continuous. They had poor personal hygiene that resulted not only in dirty hair and skin, but offensive body odor. Their dental needs were neglected to the point that T.K. had an abscessed tooth and several that were bordering on that condition. The dentist stated that she must have been in extreme pain. Indeed, when dental care was finally provided to her by her father, respondent interfered. In addition, respondent deliberately kept E.K. and T.K. hidden from their father for four years, during which she moved seven times. She married a convicted sex offender and remained with him despite being informed of the risk to the girls. Only after an incident of domestic violence and a second notification by DCFS of his status as a sex offender did she separate from her second husband. Respondent pressured T.K. to make a false accusation against her stepmother. The record also demonstrates that she was in the habit of making the girls lie for her, as when E.K. would be sent to answer the door to falsely tell caseworkers that her mother was not at home. The trial court concluded that these various forms of neglect, considered as a whole, constituted substantial neglect "over a period of years."
Having reviewed the record in detail, we cannot say that the trial court's determination of substantial and continuous neglect of E.K. and T.K. was unreasonable, arbitrary, or not based on the evidence presented. We, therefore, reverse the appellate court, and hold that the *Page 502 
trial court properly found respondent unfit as to E.K. and T.K. on the basis of section 1(D)(d) of the Act.
Respondent argues, however, that the evidence at the fitness hearing was not sufficient to support the judge's finding that she withheld E.K. and T.K. from their father for four years and that, therefore, this particular form of neglect cannot be considered part of a pattern of overall neglect. We disagree. Karen K., whom the trial court specifically found to be a credible witness, testified regarding the efforts she and John K. made from 1993 to 1997 to locate his daughters. She described eventually having to resort to the pretext of a class reunion and having a third party contact respondent's mother, who had previously denied knowing respondent's whereabouts. Karen's testimony was corroborated, in part, by respondent's own testimony in which she acknowledged frequent moves and name changes and admitted that she did not notify the circuit court of Du Page County, which had retained jurisdiction over issues related to her divorce from John, of her address changes. In addition, the trial court took judicial notice of relevant portions of the case file, which further corroborated Karen's testimony regarding their unsuccessful efforts to locate the girls for several years. And, finally, the trial court found that respondent lied on repeated occasions to caseworkers, therapists, and to the court, thus making her denials on this issue unworthy of belief. Her refusal, as late as August of 1998, to allow E.K. and T.K. to speak on the telephone to their father, and her telling the girls that she was doing so because there was a court order prohibiting it, further undermined her credibility when she disclaimed any deliberate hiding of the girls from their father. In the end, the trial court's findings of fact with regard to this particular form of neglect were not against the manifest weight of the evidence.
As to D.F., even if the other grounds affecting her *Page 503 
sisters are not considered, her failure to thrive combined with the horrendous conditions of the home could be deemed substantial neglect. At the time D.F. was diagnosed with nonorganic failure to thrive, her weight was so low that it was below the first percentile on the weight charts. After respondent was instructed on the proper way to feed the baby, she was still in the habit of leaving D.F. in the walker with a bottle, expecting the child to feed herself. After being instructed to get rid of the walker, respondent continued to use it, hiding it when caseworkers or service providers were in the home. On one occasion, after D.F. was placed in foster care, respondent, during supervised visitation, placed the baby on her back on a table and handed her a bottle. Not until the caseworker intervened, pointing out that the formula was draining down the baby's neck onto the table, did respondent pick her up to feed her properly. Respondent's neglect of D.F.'s nutritional and bonding needs resulted in her very low weight and in developmental delay that required therapy. Again, we cannot say that the trial court's determination of substantial neglect based on respondent's responsibility for D.F.'s failure to thrive and on the unsanitary conditions under which D.F. lived for several months, at a time when she was old enough to be crawling on filthy, feces-strewn floors, was unreasonable, arbitrary, or not based on the evidence presented. The neglect was also continuous, beginning in D.F.'s infancy, before the diagnosis of failure to thrive was made, and continuing even during supervised visits with the child.
Respondent argues, however, that the State should be estopped from relying on the diagnosis of failure to thrive as a basis for finding her unfit. Citing no authority for such an application of the doctrine of collateral estoppel, she asserts that because the trial court dismissed the allegation of neglect based on D.F.'s failure to thrive as part of the original neglect adjudication, the State may *Page 504 
not now use that allegation as a basis for finding her unfit. She claims that, in effect, she gave up her right to litigate this claim when she stipulated to the allegations of environmental neglect in return for the State's agreement to dismiss the failure to thrive allegation.
She is mistaken. The doctrine of collateral estoppel applies only when the point or question at issue was fully litigated in a previous case and there was a final judgment on the merits. The doctrine is not applicable to other matters that might have been litigated. Nowakv. St. Rita High School, 197 Ill. 2d 381, 390 (2001). The dismissal of the initial allegation of neglect based on failure to thrive did not constitute a decision on the merits. See In re Chilean D., 304 Ill. App. 3d 580
(1999) (the State voluntarily withdrew the petition to terminate parental rights after the finding of unfitness, but before consideration of the best interests of the child; thus, the unfitness finding was not a final adjudication on the merits and the parent cannot be estopped from relitigating fitness in the future). In any event, the doctrine of collateral estoppel requires "two separate and consecutive cases arising on different causes of action." Nowak,197 Ill. 2d at 389. The present case, although taking place in several stages, does not meet this requirement for application of the doctrine of collateral estoppel.
Respondent next argues that the environmental neglect cannot have been substantial because the State did not act immediately to remove all three children from the home. Respondent cites no authority for this assertion and we find none. We conclude that the fact that the children were left, for a time, in respondent's home despite its appalling conditions goes to the weight the finder of fact might give to this information. As we observed earlier, even if the environmental neglect, standing alone, was not substantial, it was part of an overall pattern of neglect that was substantial. *Page 505 
Respondent also asserts that she has remedied the environmental conditions that gave rise to the initial adjudication of neglect, pointing to the trial court's ruling that the State failed to prove that she had not made reasonable progress. If a finding of substantial neglect is based on her "dirty house," she argues, then the provisions in the Act relating to reasonable progress and reasonable efforts (750 ILCS 50/1(D)(m) (West 1998)), "would be rendered superfluous" because a parent could make both reasonable progress and reasonable efforts, but still be found unfit based on section 1(D)(d).
The finding of substantial neglect was not based entirely on the condition of the house. Rather, the environmental neglect was one of several factors that contributed to the trial court's finding of substantial neglect. In any event, respondent's argument about the interplay between sections 1(D)(d) and 1(D)(m) is without merit. The grounds for a finding of unfitness contained in section 1(D) of the Act are listed in the alternative. Thus, the legislature clearly intended that a parent could make both reasonable efforts and reasonable progress, defeating allegations of unfitness pursuant to section 1(D)(m), and still be found unfit based on one of the other listed grounds. 750 ILCS 50/1(D) (West 1998). Reasonable efforts and reasonable progress are not affirmative defenses that can be raised by a parent to refute an allegation of neglect under one of the other subsections of section 1(D). Rather, lack of
reasonable efforts and reasonable progress are separate and distinct bases for a finding of unfitness. A parent in respondent's position, who has been found unfit on another ground, may certainly argue to the trial court at the best interests stage that her efforts and progress demonstrate that it would be in the best interests of the children for her to retain parental rights.
In sum, we find that the trial court's judgment that *Page 506 
respondent is unfit based on her substantial and continuous neglect of E.K., T.K., and D.F. is not against the manifest weight of the evidence. The judgment of the appellate court, which reversed the trial court's ruling on this matter, is reversed.
 Vagueness
Because parental rights may be terminated upon proof, by clear and convincing evidence, of a single statutory ground for unfitness, it is unnecessary to consider whether section 1(D)(h) of the Act (750 ILCS 50/1(D)(h) (West 1998)) is unconstitutionally vague, as held by the appellate court. We, therefore, vacate that portion of the appellate court's judgment.
Similarly, we need not consider the appellate court's ruling with regard to the other two grounds upon which the trial court found respondent unfit.
 Motion for Substitution of Judge
Section 2-1001 of the Code of Civil Procedure permits a party to a civil action to petition for a substitution of judge for any one of several enumerated reasons.735 ILCS 5/2-1001 (West 1998). Respondent sought a substitution of judge for cause, pursuant to section 2-1001(a)(3), and a hearing was held as required.735 ILCS 5/2-1001(a)(3) (West 1998). The judge who presided at the hearing determined that respondent had not shown cause and denied the motion.
Respondent argued before the appellate court that the trial court erred by denying her motion for substitution of judge for cause. The appellate court rejected her argument but did not review the merits of the trial court's ruling. Instead, the appellate court found her motion untimely because it was filed before the State filed its petition to terminate parental rights, which according to the appellate court, "initiated an entirely new proceeding." 321 Ill. App. 3d at 224. The appellate court then *Page 507 
commented that if the respondent had filed a motion for substitution as of right pursuant to section 2-1001(2) (735 ILCS 5/2-1001(2) (West 1998)), and done so promptly upon the State's filing of the termination petition, it would have been error for the trial court to deny it.321 Ill. App. 3d at 224.
The State, as appellant, argues to this court that the appellate court's additional comments are dicta and urges this court to vacate that portion of the appellate court's judgment or else to address the issue on the merits. In addition, the State points out that the appellate court offered no authority for its conclusion that the filing of a petition to terminate parental rights, in a case that has been proceeding under the Juvenile Court Act for several years, "begins a new case within that case number." 321 Ill. App. 3d at 224. Respondent argues, in turn, that if the termination proceedings are new proceedings that permit either party to obtain a substitution of judge as of right, the new proceeding should be deemed to have begun when the permanency goal is changed to substitute care pending determination on a petition to terminate parental rights.
After a careful review of the transcripts of the hearing on respondent's petition for substitution and of the hearing in which she asserts the judge displayed some bias toward her, we conclude that the judge's comments, while critical of respondent's credibility, did not demonstrate bias against her. We, therefore, affirm the judgment of the trial court denying respondent's motion for substitution for cause. We need not consider the issue raised sua sponte by the appellate court — whether the motion was timely — because the motion failed on the merits. The remainder of the appellate court's discussion of this issue, concluding that the filing of a petition to terminate parental rights initiates an entirely new proceeding, is dicta, which we vacate. *Page 508 
 CONCLUSION
For the foregoing reasons, we reverse that part of the judgment of the appellate court which reversed the circuit court's termination of respondent's parental rights under section 1(D)(d). We vacate that part of the appellate court's judgment which held section 1(D)(h) unconstitutional. We affirm that part of the appellate court's judgment which affirmed the circuit court's denial of respondent's motion for a substitution of judge, but we reject the rationale offered by the appellate court. The judgment of the circuit court is affirmed.
Appellate court judgment affirmed in part, vacated inpart, and reversed in part; circuit court judgmentaffirmed.
JUSTICE RARICK took no part in the consideration or decision of this case.