NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 230676-U

NO. 4-23-0676

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 4, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Z.M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 20JA299 |
| v. | ) | |
| Daniel M., | ) | Honorable |
| Respondent-Appellant). | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE DeARMOND delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court granted appellate counsel's motion to withdraw and affirmed
the circuit court's judgment terminating respondent's parental rights, concluding
no meritorious issues could be raised on appeal.

¶ 2    In July 2023, the circuit court terminated the parental rights of respondent, Daniel

M. (Father), to his minor child, Z.M. (born in October 2019). Father appealed, and appellate

counsel was appointed to represent him. Appellate counsel now moves to withdraw, citing

*Anders v. California*, 386 U.S. 738 (1967), and *In re S.M.*, 314 Ill. App. 3d 682, 732 N.E.2d 140

(2000), asserting he cannot raise any potentially meritorious argument on appeal. We grant the

motion to withdraw and affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4 On August 27, 2020, the State filed its initial neglect petition, alleging Z.M. was neglected and her environment was injurious to her welfare pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)) because, *inter alia*, Father has "a substance abuse issue," which prevented him from parenting properly. The petition alleged Z.M. "was left outside for an extended period of time with no adult supervision," thereby placing her at risk of harm. The State filed an amended neglect petition on December 21, 2020, alleging a well-child visit revealed Z.M. had a high level of lead in her system. The State filed a second amended neglect petition on June 4, 2021, alleging Z.M.'s siblings were also left outside for an extended period of time without adult supervision. Father stipulated Z.M. and her siblings were left outside without adult supervision, waived the adjudication hearing, and agreed Z.M. would be placed in the custody of the Illinois Department of Children and Family Services (DCFS). The circuit court accepted the stipulation, adjudicated Z.M. neglected, and made her a ward of the court.

¶ 5 On May 5, 2023, the State filed an amended motion seeking to terminate Father's parental rights, alleging Father failed to make reasonable efforts to correct the conditions that caused Z.M.'s removal, make reasonable progress toward Z.M.'s return to his custody, or maintain a reasonable degree of interest, concern, or responsibility as to Z.M.'s welfare during the nine-month periods from June 4, 2021, through March 4, 2022, from March 4, 2022, through December 4, 2022, and from June 7, 2022, through March 7, 2023. 750 ILCS 50/1(D)(b), (m)(i)-(ii)(West 2022).

¶ 6 During the fitness hearing on May 5, 2023, the State presented the testimony of Maria Gallegos, the DCFS caseworker assigned to Z.M.'s case. Gallegos worked on Z.M.'s case from January 2022 until June 2023. Gallegos made monthly attempts to contact Father through

registered letters, phone calls, and home visits, but Father never responded. Gallegos had no contact with Father until the fitness hearing.

¶ 7    Father completed an integrated assessment, which DCFS used to create service plans for him. The plans required Father to complete parenting classes, substance abuse treatment, domestic violence counseling, and mental health counseling. Gallegos testified Father knew the services he needed to complete, as well as the importance of completing those services. Father was required to complete domestic violence counseling due to "several domestic battery police reports," including a police report indicating "he was involved in second-degree murder." Additional police reports and prior DCFS investigations showed Father had a "history of alcohol being present when he has been involved in domestic altercations." During one instance when Father was responsible for looking after the children, Father placed one of his children in a bathtub filled with hot water, causing the child to suffer second-degree burns. Father did not complete any of the required services.

¶ 8    According to Gallegos, Father made no efforts to attend or participate in child-parent visits, had no communication with the children, and some of his children "witnessed him battering the mother." Father lost his visitation privileges after a warrant was issued for his arrest in August or September 2022. However, Father knew he was entitled to visitation prior to the warrant's issuance. The last time he visited Z.M. was in fall 2021. DCFS had concerns about Father's ability to parent Z.M. safely due to Father's criminal history and "his inability to take responsibility for his actions."

¶ 9    On June 28, 2023, the hearing continued. Father testified on his own behalf, saying he was put in contact with the DCFS caseworker when Z.M.'s case opened in 2021. Father insisted he started parenting classes, he initially complied with drug tests, and he began

taking a mental health assessment. However, Father acknowledged he did not finish the required services. Father said he "lost contact" with DCFS when Gallegos was assigned to the case. Father testified he "left multiple messages" with Gallegos's supervisor, but he "never received a call back." On cross-examination, Father admitted there was an active warrant out for his arrest during the time when he was not in contact with DCFS. The warrant included a second degree murder charge. Father admitted at least nine months elapsed between the issuance of the warrant and when he was arrested and incarcerated on April 10, 2023. Warrants were also issued in his pending domestic violence criminal case, and he had a pending criminal charge for possession of a firearm at the time of the hearing.

¶ 10      On July 26, 2023, the circuit court found Father to be an unfit parent, noting he failed to fulfill his obligations under the service plans. The court observed Father, "for a substantial period of time, a nine-month period, was actually a fugitive and had a warrant outstanding, at which time he was not visiting or engaged in any services." The court highlighted the fact that Father "missed a substantial amount of visitation time," noting Father's most recent visit with Z.M. occurred in fall 2021. The court deemed Gallegos's testimony "completely credible," and it held the State proved the counts against Father by clear and convincing evidence.

¶ 11      On the same day, the circuit court conducted a best interest hearing. According to the best interest report, Z.M. began living with her aunt, Carrah C., on June 7, 2021. Z.M. was one year old at the time. Carrah consistently provided for all of Z.M.'s basic needs, including food, shelter, health, and clothing, and she ensured Z.M. attended required medical appointments. Carrah and Z.M. formed "a loving relationship" and "a trusting bond." Z.M. "appear[ed] to feel very safe" in Carrah's home, and Z.M. looked to her "for support, comfort,

guidance, and security." Z.M. enjoyed a sense of familiarity in Carrah's home, and Carrah established stable and predictable routines around bedtime, meals, and other activities. Z.M. was "fully accepted" by Carrah's family, and Z.M. willingly accepted affection from them. Carrah was a "strong advocate" for Z.M., and she was willing to provide Z.M. with any services or social interactions necessary for her to thrive. Jaimi Kitchen, the DCFS caseworker who replaced Gallegos, testified she reviewed the case materials and confirmed the best interest report's contents remained accurate and current.

¶ 12        Father testified he was Z.M.'s primary caregiver before he was incarcerated and believed he would be able to care for Z.M. if he obtained release. Father was confident he would be able to find employment and provide housing for Z.M. if he were released. Father insisted he would be a "positive influence" in Z.M.'s life, and he would not continue to find himself on the wrong side of the law. On cross-examination, Father acknowledged he had not seen Z.M. for nearly two years. At the time of the hearing, Father was incarcerated and awaiting trial for second degree murder, and he intended to go to trial on two counts of domestic battery.

¶ 13        The guardian *ad litem* proffered she conducted a home visit of Z.M.'s current placement, where she witnessed "voluminous" spontaneous displays of affection. The guardian *ad litem* asserted, "The love in that home between Ms. C[.] and [Z.M.] is very clear, and the bond was very clear ***." Carrah was willing to adopt Z.M.

¶ 14        The circuit court found it was in Z.M.'s best interest to terminate Father's parental rights, noting Z.M. was integrated into Carrah's family, and she had not seen Father in nearly two years. The court found the State proved by a preponderance of the evidence it was in Z.M.'s best interest to terminate Father's parental rights.

¶ 15        This appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17          On appeal, Father's appointed appellate counsel filed a motion seeking leave to

withdraw as counsel pursuant to *Anders* and *S.M.*. Appellate counsel argues he cannot raise any

arguments of potential merit on appeal. We agree and grant the motion to withdraw.

¶ 18                              A. Unfitness Finding

¶ 19          The Juvenile Court Act and the Adoption Act (750 ILCS 50/1 *et seq.* (West

2022)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777

N.E.2d 930, 940 (2002). To terminate an individual's parental rights, the State must first show

the parent is an "unfit person," and then the State must show terminating parental rights serves

the child's best interest. *D.F.*, 201 Ill. 2d at 494-95 (citing the Adoption Act (750 ILCS 50/1(D)

(West 1998)) and the Juvenile Court Act (705 ILCS 405/2-29(2) (West 1998))). We will not

disturb a circuit court's unfitness finding unless it is against the manifest weight of the evidence,

which "is a deferential standard of review." *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68, 162

N.E.3d 454. "A finding is against the manifest weight of the evidence only if the evidence

clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the

circuit court's finding on the basis of the evidence in the record [citation]." (Internal quotation

marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 20          Under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West

2022)), a parent may be found unfit if he fails to "make reasonable progress toward the return of

the child to the parent during any 9-month period following the adjudication of neglected ***

minor." A "parent's failure to substantially fulfill his or her obligations under the service plan

and correct the conditions that brought the child into care during any 9-month period following

the adjudication" constitutes a failure to make reasonable progress for purposes of section 1(D)(m)(ii). 750 ILCS 50/1(D)(m)(ii) (West 2022).

¶ 21    Appellate counsel contends there is no meritorious issue to raise on appeal regarding the circuit court's fitness finding because the evidence indicates Father failed to complete the services recommended in the service plan during the nine-month periods from June 4, 2021, through March 4, 2022, from March 4, 2022, through December 4, 2022, and from June 7, 2022, through March 7, 2023. The service plan required Father to complete parenting classes, substance abuse treatment, domestic violence counseling, and mental health counseling. According to Gallegos, Father knew his obligations under the service plan, but he did not fulfill them. The record also showed Z.M. had recently turned two years old when Father last visited her. When the court found Father unfit on July 26, 2023, Z.M. was a few months shy of turning four years old. Further, as the court aptly observed in its unfitness finding, "for a substantial period of time, a nine-month period, [Father] was actually a fugitive and had a warrant outstanding, at which time he was not visiting or engaged in any services." Based on the evidence presented, the court's unfitness finding was not against the manifest weight of the evidence, as the opposite conclusion is not clearly evident. See *J.H.*, 2020 IL App (4th) 200150, ¶ 68. Therefore, we agree with appellate counsel that no meritorious argument can be made the court erred in finding Father unfit.

¶ 22                    B. Best Interest Finding

¶ 23    Appellate counsel next asserts he can make no meritorious argument that the circuit court's best interest finding was against the manifest weight of the evidence.

¶ 24    After a parent is found unfit, "the focus shifts to the child." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). The issue ceases to be "whether parental rights *can* be

terminated" and becomes "whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The circuit court will consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005). Those factors include: the child's physical safety and welfare; the development of the child's identity; the child's familial, cultural, and religious background and ties; the child's sense of attachments, including where the child feels loved, attached, and valued; the child's sense of security, familiarity, and continuity of affection; the child's wishes and long-term goals; the child's community ties; the child's need for permanence; and the uniqueness of every family and each child. 705 ILCS 405/1-3(4.05) (West 2022). We will not overturn a court's best interest finding unless it is against the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 291 (2009).

¶ 25        Here, the circuit court's best interest finding was not against the manifest weight of the evidence. The record shows the best interest factors—including Z.M.'s physical safety and welfare, her senses of familiarity, attachment, and security, and her need for permanence— favored the termination of Father's parental rights. According to the best interest report, Z.M. had lived with Carrah since she was one year old, she formed a loving and trusting relationship with Carrah, she felt safe in Carrah's home, and she looked to Carrah "for support, comfort, guidance, and security." Carrah met Z.M.'s needs, which included providing Z.M. with food, shelter, and clothing, taking Z.M. to medical appointments, and creating a stable routine for Z.M. Carrah's family accepted Z.M. as one of their own and showed her affection. Z.M. accepted their affection willingly. During a home visit, the guardian *ad litem* witnessed many spontaneous displays of affection, and the love and bond shared by Z.M. and Carrah was "very clear." Thus,

the circuit court's best interest decision was not against the manifest weight of the evidence, as the opposite conclusion was not clearly evident. See *T.A.*, 359 Ill. App. 3d at 960. Based on our review of the record on appeal, we agree with appellate counsel no meritorious argument can be made that the court's best interest determination was against the manifest weight of the evidence. Accordingly, we grant counsel's motion to withdraw and affirm the court's judgment.

¶ 26                                    III. CONCLUSION

¶ 27          For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the circuit court's judgment.

¶ 28          Affirmed.