NOTICE

Decision filed 06/26/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 190112-U

NO. 5-19-0112

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| WILLIAM BOUDET, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 19-OP-13 |
| | ) | |
| JAMES D. ROBERTSON, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Moore and Overstreet concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Where the trial court's entry of a two-year plenary order of protection was not contrary to the manifest weight of the evidence, we affirm the trial court's judgment. Where the record fails to support James D. Robertson's claim that the trial court's 2019 plenary order of protection was based upon 2017 incidents that resulted in a 2017 plenary order of protection, we affirm the trial court's order. Where William and Marcia Boudet established that two incidents involving James D. Robertson constituted harassment, and those claims were not rebutted, we affirm the trial court's plenary order of protection.

¶ 2    James D. Robertson appeals from the trial court's plenary order of protection entered on February 21, 2019, in favor of William Boudet and his wife and son. In early 2016, the Boudets adopted Robertson's biological son. Due to continued contact attempts between Robertson and the Boudets, Boudet sought and obtained an emergency order of protection on February 7, 2017. A

1

subsequent plenary order of protection was entered on behalf of the Boudets that expired on February 7, 2019.

¶ 3    William Boudet filed the 2019 request for an emergency order of protection based upon two events that occurred while the 2017 order was in place. Robertson asks this court to reverse the plenary order of appeal. First, he argues that the trial court improperly based its 2019 plenary order of protection determination on the facts that supported the court's 2017 plenary order of protection. Second, Robertson argues that the trial court's order was erroneous because the evidence of "abuse" did not meet the standards required by the Illinois Domestic Violence Act of 1986. For the reasons stated in this order, we affirm the February 21, 2019, plenary order of protection.

¶ 4                                          BACKGROUND

¶ 5    The facts underlying this case involve the adoption of a six-year-old boy, D.B. D.B. was legally adopted by William and Marcia Boudet on April 14, 2016. The adoption process began in 2015 when Robertson and his mother-in-law, Dawn Obrecht, asked the Boudets to adopt the child. At that time, Obrecht was a disabled diabetic who lived with Robertson and required constant care. At the same time, Robertson was suffering from colon cancer. Robertson and Obrecht lived near a church attended by the Boudets. Robertson and Obrecht claim that the adoption was intended to be a temporary custody arrangement until Robertson recovered from cancer. The Boudets claim that there was no question that both Robertson and Obrecht asked them to adopt D.B.

¶ 6    After the Boudets legally adopted D.B., the difficulties with Robertson began. The 2017 order of protection documents (listing incidents involving Robertson) were attached as an exhibit to the 2019 petition for an emergency order of protection. We include this pre-2017 history for context on the relationship of the parties.

¶ 7                                    2017 Order of Protection

¶ 8    Shortly after the Boudets' adoption was finalized, Robertson continued to contact the Boudets to request overnight weekend stays. Robertson showed up at D.B.'s baseball practice on April 23, 2016, where he "made a scene" because the Boudets denied his request for an overnight stay. However, the Boudets allowed D.B. to have a 90-minute visit at the Robertson's home. Upon arrival at Robertson's home to pick up D.B. after his visit, the Boudets found their son sitting alone outside. The Boudets learned that Robertson and Obrecht spent the visit repeatedly telling D.B. that he was not a "Boudet" and that he was a "Robertson." Obrecht also successfully upset D.B. by telling him that his parents, the Boudets, had broken her heart.

¶ 9    In May 2016, Robertson accused Marcia Boudet of reporting him to the Social Security Administration for disability benefits fraud.

¶ 10   In October 2016, Robertson went into the children's section of the church to find D.B. The Boudets witnessed Robertson whispering in D.B.'s ear. D.B. later told his parents that Robertson bet him $1 that they would not let allow Robertson to spend time with him. Robertson told the Boudets that he meant this as a joke. Later in October, Robertson again requested overnight visits with D.B. Then, the next day at a church family meal, Robertson announced that he had been consuming alcoholic beverages all afternoon, and then "exploded" upon being told that he could not engage in visits and/or overnights with D.B. At this event, Robertson grabbed D.B.'s shoulders and yelled at him: "I told you I'd never lie to you, didn't I? Didn't I? They hate me! They hate me."

¶ 11   In early November 2016, the Boudets and Robertson attended a meeting with the church pastor. At the meeting, the Boudets informed Robertson that he could not have any contact "for a

3

while" and that they would let Robertson know when this changed. Robertson replied: "So, this is how it's going to be."

¶ 12    In early December 2016, Robertson contacted the Boudets about obtaining school and soccer photographs, about getting Christmas gifts to D.B., and asking when he could see D.B. Just before Christmas, the Boudets and D.B. met Robertson and his brother Charlie at the church for a Christmas gift exchange. In D.B.'s presence, Robertson complained about his inability to spend time with him. Robertson whispered in D.B.'s ear, that "you know Daddy loves you." After this visit, Robertson started badgering the Boudets about seeing D.B. and then threatened to attend church on Christmas day to "call out" the Boudets in front of the congregation.

¶ 13    In mid-January 2017, Robertson texted the Boudets asking if they could bring D.B. to the church for a visit. The Boudets declined. After the service concluded, Robertson ran towards D.B. and yelled, "Daddy loves you." The same day, Robertson texted the Boudets to tell them that his counselor told him to contact D.B. twice per week. Later in the month, Robertson texted the Boudets to tell them that he had been in contact with the Department of Children and Family Services (DCFS) about his desire to have time with D.B.

¶ 14    In February 2017, the Boudets asked the trial court for an emergency order of protection against Robertson. The Boudets alleged that they filed the petition because Robertson would not stop harassing them about spending time with D.B. and that he refused to accept their negative responses to those requests. The Boudets concluded their petition stating that Robertson had offered nothing within the previous 10 months to show that he could be a positive influence on D.B.'s life.

4

¶ 15    The trial court granted the Boudets' request for an emergency order of protection on February 7, 2017. The court subsequently extended the order until February 7, 2019, by entering a plenary order of protection.

¶ 16                    2019 Order of Protection

¶ 17    On February 7, 2019, the day that the 2017 order of protection was set to expire, William Boudet filed a second request for an emergency order of protection. In the petition, Boudet listed his relationship with Robertson as: "Other Related by Blood or Marriage." Boudet alleged that there had been several criminal cases between the parties, but there were no additional details about the criminal cases included in the petition.

¶ 18    Boudet detailed two new incidents of harassment involving Robertson in the petition and attached a copy of the list of harassment incidents that were the basis of the 2017 petition. The first incident occurred one month after the 2017 order was entered. On March 7, 2017, Robertson violated the order of protection by appearing at William Boudet's place of employment—Murphysboro High School. Police were contacted and Robertson was charged with a violation of the order of protection. The second incident occurred on February 3, 2019, when Robertson drove by the Boudets' home while honking his horn. (We note, parenthetically, that the petition mistakenly states that the event occurred on February 3, 2018. However, Marcia testified at trial that she simply wrote the wrong year in the 2019 petition.) As the street where the Boudets live is a public road, Robertson's actions did not technically constitute a violation of the order. However, the incident was emotionally upsetting to Marcia Boudet who witnessed the event. On that date at approximately 1:30 p.m., Robertson drove by the Boudets' home while honking the horn of his vehicle.

5

¶ 19   In the petition, Boudet stated that the 2017 order had been effective and successful in keeping Robertson away from his family. "Without another order, the harassment will begin. It seems apparent that Mr. Robertson responds to the legal document." Boudet stated that Robertson's life was one of constant turmoil, chaos, and disruption and that he always tried to pull others into his turmoil. He described D.B.'s former life as one of constant upheaval and unrest—that D.B. suffered abuse, neglect, and trauma. In the preceding two years under the original order, Boudet commented that D.B. had blossomed. He was doing well in school, was emotionally balanced, and was happy and healthy. In seeking continued peaceful progress for D.B., Boudet stated:

> "We are seeking the new order of protection to allow [D.B.] the continued opportunity to live and grow peacefully, without the fear or wonder of when/if Mr. Robertson might show up. Under the present order, [D.B.] questioned what would happen if Mr. Robertson did make his presence known at an event, business, church, or restaurant. [D.B.] was calm and relieved when it was explained Mr. Robertson would have to leave and no contact was allowable. [D.B.] rarely speaks of Mr. Robertson and when he does, it's always in reference to an incident involving the police, a confrontation with a neighbor or some negative, non-peaceful event."

¶ 20   The trial court entered the emergency order of protection on February 7, 2019. Robertson was served with a copy of the order that same date.

¶ 21   Following a hearing held on February 21, 2019, the trial court entered a plenary order of protection to remain in effect until February 21, 2021. We briefly summarize the hearing below.

¶ 22                            Testimony of William Boudet

¶ 23   William Boudet testified that he and Marcia met D.B. at their church which was geographically located near the Robertson home. He and Marcia frequently volunteered at the church. William testified that he never saw D.B. playing outside of his home.

¶ 24   William testified that Robertson and his mother-in-law, Dawn Obrecht, asked the Boudets to adopt D.B. He indicated that there was no possible way that he and Marcia were mistaken about

6

Robertson's request that they adopt D.B. Originally, Robertson and Obrecht stated that they wanted to keep D.B. through Christmas and that the Boudets could adopt him in January 2016. However, the next week in September 2015, faced with having to go to D.B.'s parent-teacher conference, Robertson and Obrecht contacted the Boudets and stated that they "couldn't do it anymore" and asked them to pick D.B. up. At that point, he and Marcia began the formal adoption process.

¶ 25    When D.B. came to live with the Boudets he was taking medication for attention deficit hyperactivity disorder (ADHD). He and Marcia spoke with D.B.'s teacher and his physician and began the process of weaning him from the ADHD medication. By Christmas, D.B. was taking no ADHD medication and was doing well. After D.B.'s 2016 adoption, the Boudets took D.B. to weekly psychological counseling because of abuse he had suffered when living with Robertson.

¶ 26    William testified that every time Robertson would spend time with D.B., D.B.'s behavior would change after the visit in that D.B. was physically rough, his tone of speech changed, and he would not obey his parents. William said that every time Robertson spent time with D.B., it would take two to three days before D.B. could calm down. William admitted that he did not want D.B. to spend any time with Robertson until he was an adult.

¶ 27                        Testimony of Marcia Boudet

¶ 28    Marcia Boudet testified that Robertson and Obrecht asked her and William to adopt D.B. She stated that Robertson and Obrecht could not have been mistaken about the process because they were involved and appeared in court throughout the adoption process. Marcia did not know whether Robertson had difficulty with reading but stated that he had the ability to read text messages and D.B.'s schoolwork.

7

¶ 29    Marcia testified that D.B. had never said that he missed Robertson or that he would like to see him. She acknowledged that occasionally D.B. mentioned Robertson, but only with respect to what she classified as negative experiences. Marcia provided two examples of these negative experiences—police involvement with Robertson and bricks being thrown by someone through the windows of Robertson's home.

¶ 30    Marcia testified that on February 3, 2019, she witnessed Robertson drive past her home while honking his vehicle horn. She explained that she wrote the wrong date on the most recent petition for an order of protection—that this happened in 2019, not in 2018. She also stated that while she knew that he did not violate the previous order of protection by driving on the public road in front of her home, his behavior was reminiscent of his past harassment, and thus emotionally difficult for her.

¶ 31    In conclusion, Marcia concurred with William's sentiment and stated that she did not want D.B. to see Robertson until he reached adulthood and could make that decision on his own.

¶ 32                              Testimony of Dawn Obrecht

¶ 33    Dawn Obrecht testified that she was D.B.'s maternal grandmother—that her daughter and Robertson were D.B.'s parents. At the time of Obrecht's testimony, she had been living with Robertson and assisting with his living expenses for approximately three years. Obrecht testified that she was diabetic and was on disability. Due to the diabetes, Obrecht could no longer live by herself because she was prone to falling into diabetic comas. She testified that Robertson did not work and that he suffered from a bad back and hip.

¶ 34    Prior to the adoption, Robertson and Obrecht allowed D.B. to attend church activities with the Boudets. At the time of D.B.'s adoption, Obrecht had been living with Robertson and D.B. for

8

approximately one year. Obrecht testified that in that year she saw no abusive behavior by Robertson against D.B. and characterized their relationship as strong and loving.

¶ 35    Obrecht disputed that they asked the Boudets to adopt D.B. Instead, she testified that they asked the Boudets to take temporary custody of D.B. due to Robertson's colon cancer diagnosis. On cross-examination, Obrecht testified that although Robertson had colon cancer at that time, he was not bedridden or incapacitated.

¶ 36    Obrecht testified that Robertson had taken his car in for repair at a Murphysboro auto body shop in early February and that the auto body shop was close to the Boudets' home. There was, however, more than one route to the auto body shop. Therefore, Robertson would not have had to drive past the Boudets' home.

¶ 37                                    Testimony of James D. Robertson

¶ 38    Robertson testified next. His attorney asked him to read a legal document in order to establish that he could not read well enough to understand the adoption documents when he reviewed them. Robertson was unable to read some of the words in the legal document.

¶ 39    Robertson testified that the Boudets frequently asked him if they could adopt D.B. and that he always answered that question in the negative. He denied that he asked the Boudets to adopt D.B. and testified that he believed that they would have temporary custody until he "got feeling better." Robertson alleged that before the adoption and up to two months after the adoption the Boudets told him that he could see his son whenever he wanted, including weekends. He denied that he had seen D.B. since the Boudets adopted him.

¶ 40    Robertson denied that he had ever been physically or emotionally abusive to D.B. He stated that as D.B.'s father, they would work in the yard and build things. On cross-examination, Robertson testified that D.B. had been prescribed ADHD medication about one to two months

9

before the Boudets took custody of him. He admitted that he was a strict parent but denied ever disciplining D.B. because D.B. never did anything wrong.

¶ 41    Robertson was asked about some of the incidents alleged in the 2017 order of protection petition. Robertson acknowledged that he had approached the church to tell his son that he loved him. He testified that on the night he got upset at the church meal, D.B. came up to him and whispered in his ear that he loved him and wanted to come home. He denied telling anyone at church that he had spent the afternoon drinking alcoholic beverages.

¶ 42    Robertson testified about the incident at Murphysboro High School for which he was charged with violating the 2017 order of protection. He claimed that DCFS brought his nephew to his home the morning of the violation to stay with Robertson because the parents were being physically abusive. DCFS directed Robertson to take his nephew to school. The nephew's school was Murphysboro High School. Robertson drove him to school, walked with him into the school, and signed his nephew into the school. By the time he had gotten back home, the police were waiting for him and placed him under arrest for violating the 2017 order of protection.

¶ 43    Robertson denied that he drove by the Boudets' home and honked the horn on February 3, 2019.

¶ 44    While Robertson testified that he did not want to have a relationship with the Boudets, he would like to have some relationship with D.B.

¶ 45                              Argument and Ruling on Plenary Order

¶ 46    At the conclusion of the testimony, the trial court heard argument by the attorneys representing each side.

¶ 47    Robertson's attorney argued that there was no evidence that his client had ever been abusive to or endangered the welfare of D.B. He argued that it was clear that Robertson and

10

Obrecht loved D.B. He argued that his client had no reason to drive by the Boudets' home and honk his horn in February 2019 as alleged. He further argued that even if the trial court believed that Robertson had driven by the Boudets' home while honking his horn, the behavior could not amount to stalking. He concluded by stating that the plenary order was patently unfair when Robertson simply wanted to watch his biological child play baseball. He implored the trial court to *voir dire* D.B. back in chambers to ask D.B. if he wanted to spend time with his father.

¶ 48     In response, the attorney for the Boudets noted that Marcia did not believe that Robertson violated the order of protection when he drove past her home and honked his horn. However, the incident made her fearful and brought back many bad memories. While Robertson and Obrecht may very well love D.B., the attorney argued that allowing Robertson to spend time with D.B. would not be in D.B.'s best interests even though he was D.B.'s biological father. He also argued that it would not be in D.B.'s best interests to be interviewed by the trial judge because the interview questions could undo some of the positive work achieved in stabilizing him since the adoption.

¶ 49     The trial court denied the motion to *voir dire* D.B. The court stated that it had no doubt that Robertson and Obrecht loved D.B. However, considering the testimony and evidence heard, the trial court granted the plenary order of protection for a period of two years under the same no contact terms and conditions as the 2017 plenary order.

¶ 50                                     ANALYSIS

¶ 51     Robertson appeals to this court from the trial court's February 21, 2019, plenary order of protection. A plenary order is considered a final judgment, and therefore we have jurisdiction to hear this appeal pursuant to Illinois Supreme Court Rule 301. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); see also *Scheider v. Ackerman*, 369 Ill. App. 3d 943, 945, 860 N.E.2d 1140, 1141 (2006).

11

¶ 52    We note that Boudet has not filed a brief in this appeal. While the reviewing court is not required to serve as an advocate for the appellee "and is not required to search the record for the purpose of sustaining the trial court's judgment, 'if the record is simple and the claimed errors are such that the court can easily decide them without the aid of an appellee's brief, the court of review should decide the merits of the appeal.' " *Stapp v. Jansen*, 2013 IL App (4th) 120513, ¶ 14, 988 N.E.2d 234 (quoting *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133, 345 N.E.2d 493, 495 (1976)).

¶ 53    Robertson raises two issues on appeal. He argues that the trial court committed reversible error by considering evidence in the 2019 order of protection hearing that had been utilized in the 2017 order of protection case. Robertson alternatively argues that the evidence of the two incidents after entry of the 2017 order of protection were insufficient to warrant the trial court's 2019 order granting Boudet's request for a two-year plenary order of protection.

¶ 54    To properly analyze these issues, we turn to the relevant statutory definitions and rules regarding orders of protection. Persons protected by the Illinois Domestic Violence Act of 1986 (Act) include "any person abused by a family or household member." 750 ILCS 60/201(a)(i) (West 2018). The term "family" is defined to include "persons who have or allegedly have a child in common." *Id.* § 103(6). The petitioner seeking the order of protection includes the named petitioner and any named victim of abuse and any other person protected by the Act. *Id.* § 103(13). A petition for an order of protection may be filed by an adoptive parent of a child who has been abused. *Id.* § 201(b)(iii)(C). The term "abuse" is defined to include physical abuse and harassment. *Id.* § 103(1).

¶ 55    The Act further defines the term "harassment" to include "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a

12

reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(7). The trial court should find that the following behaviors presumptively cause emotional distress, unless rebutted by a preponderance of the evidence:

> "(i) creating a disturbance at petitioner's place of employment or school;

> (ii) repeatedly telephoning petitioner's place of employment, home or residence;

> (iii) repeatedly following petitioner about in a public place or places;

> (iv) repeatedly keeping petitioner under surveillance by remaining present outside his or her home, school, place of employment, vehicle or other place occupied by petitioner or by peering in petitioner's windows;

> (v) improperly concealing a minor child from petitioner, repeatedly threatening to improperly remove a minor child of petitioner's from the jurisdiction or from the physical care of petitioner, repeatedly threatening to conceal a minor child from petitioner, or making a single such threat following an actual or attempted improper removal or concealment, unless respondent was fleeing an incident or pattern of domestic violence; or

> (vi) threatening physical force, confinement or restraint on one or more occasions." *Id.* § 103(7)(i)-(vi).

¶ 56    The trial court should enter an order of protection "[i]f the court finds that petitioner has been abused by a family or household member ***." *Id.* § 214(a). Potential remedies include prohibiting the "respondent's harassment *** if such abuse *** has occurred or otherwise appears likely to occur if not prohibited." *Id.* § 214(b)(1). The trial court must consider the following relevant factors in deciding whether to award a remedy pursuant to the Act:

> "(i) the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner or any family or household member *** and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household; and

> (ii) the danger that any minor child will be abused or neglected ***." *Id.* § 214(c)(1).

The trial court must also consider any other relevant factors in reaching a decision as to whether to award remedies to the petitioner. *Id.* Finally, if the balance of hardships does not warrant a

13

remedy, the trial court must include a finding in its order that "granting the remedy will result in hardship to respondent that would substantially outweigh the hardship to petitioner from denial of the remedy." *Id.* § 214(d).

¶ 57    In reviewing a trial court's finding that the petitioner was abused and that an order of protection is needed, we must utilize the manifest weight of the evidence standard. *Stapp*, 2013 IL App (4th) 120513, ¶ 16 (citing *Best v. Best*, 223 Ill. 2d 342, 349-50, 860 N.E.2d 240, 244-45 (2006)). "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best*, 223 Ill. 2d at 350 (citing *In re D.F.*, 201 Ill. 2d 476, 498, 777 N.E.2d 930, 942-43 (2002)). With this standard of review, we defer to the trial court as the finder of fact because the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id.* (citing *In re D.F.*, 201 Ill. 2d at 498-99). On appeal, where a conflict exists in the testimony of witnesses, the reviewing court must "not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best*, 223 Ill. 2d at 350-51 (citing *In re D.F.*, 201 Ill. 2d at 499); *Stapp*, 2013 IL App (4th) 120513, ¶ 17. "A reviewing court should not overturn a trial court's finding of fact merely because it might have reached a different decision." *Stapp*, 2013 IL App (4th) 120513, ¶ 17 (citing *Bazydlo v. Volant*, 164 Ill. 2d 207, 214, 647 N.E.2d 273, 276 (1995)).

¶ 58                      2017 Plenary Order of Protection Evidence

¶ 59    Before we address Robertson's issue involving the trial court's alleged use of the 2017 evidence, we note that he initially veers from the stated issue in two different ways. We briefly address these two additional arguments.

14

¶ 60    Robertson first contends that the trial court's entry of the 2019 plenary order of protection was an extension of the 2017 order. However, nothing in the record on appeal supports Robertson's theory. Furthermore, Boudet did not request an extension of the original order of protection. Section 220(e) of the Act allows for extension of a plenary order "one or more times," so long as the requirements of a new petition for a plenary order of protection are satisfied. 750 ILCS 60/220(e) (West 2018). Those requirements are: (1) that the trial court has jurisdiction; (2) that the petitioner has been "abused" by a family or household member and that there is a remedy available; (3) that a general appearance has either been made or filed on behalf of the respondent or that the respondent has been properly served with process; and (4) that the respondent has either answered the petition or is in default. *Id.* § 219. Boudet did not ask for an extension of the plenary order of protection. Furthermore, the trial court did not treat Boudet's emergency petition as a request for an extension of the 2017 plenary order. Here, the trial court initially entered an emergency order of protection, and at the plenary hearing and in its subsequent plenary order, the trial court made no verbal or written statement that the order was to be treated as an extension of the 2017 order. We conclude that Robertson's argument that the trial court treated Boudet's petition as a request for an extension of the 2017 order does not have merit.

¶ 61    Alternatively, Robertson argues that Boudet is somehow precluded from seeking a new emergency petition for an order of protection against him. Robertson cites no legal support for this theory. We have reviewed the relevant statutory sections of the Act and find no statutory section that would preclude a petitioner from filing a subsequent petition for an emergency order of protection. See *id.* § 202(a)(1) (that an action is commenced "[b]y filing a petition for an order of protection in any civil court"); *id.* § 217 (stating that an emergency order of protection will be

15

issued if the petitioner satisfies the requirements for one or more of the requested remedies). We conclude that Robertson's argument regarding successive petitions does not have merit.

¶ 62    Finally, turning to the stated issue, Robertson claims that the trial court improperly considered the allegations from the 2017 petition as evidence supporting the 2019 petition. Robertson cites no authority to support his argument that this was improper. Boudet outlines the two new incidents involving Robertson in the 2019 petition, and states: "Please see attached statement from previously granted order of protection, granted 2/7/2017." Both William and Marcia Boudet testified at the 2019 hearing about D.B.'s adoption and how he was thriving in their family. They both testified that Robertson and Obrecht asked them to adopt D.B. William testified about medical and psychological care they provided D.B. after he began living with them. Initially after the adoption, the Boudets allowed D.B. to spend time at the Robertson home. William testified that D.B. went through a period of adjustment with behavioral issues after each visit with Robertson. Marcia testified that D.B. never said that he missed Robertson and when he did talk about Robertson, he spoke of specific negative situations he remembered. She also testified about the 2019 incident when Robertson drove past her home while honking his horn and explained why this incident was difficult for her—that the incident was reminiscent of his past harassment. As the original plenary order was about to expire, Robertson's behavior in honking his horn as he drove past the Boudets' home frightened and intimidated Marcia. Marcia was fearful that Robertson was planning to resume his nonstop harassment as soon as the order expired.

¶ 63    We note that the thrust of Robertson's defense and argument against the order of protection in the trial court was focused on the legitimacy of the adoption. Both Robertson and Obrecht testified that they did not consent to a permanent adoption but believed that they were entering into a temporary custodial situation with the Boudets. The Boudets were then recalled to testify

16

and affirmed that both Robertson and Obrecht asked them to adopt D.B. In Robertson's argument at the conclusion of the hearing, his attorney continued to focus on the legitimacy of the adoption, stating that Robertson had never been abusive or endangered D.B.'s welfare and that he and Obrecht clearly loved D.B. His attorney again asked the court to question D.B. in chambers to find out if D.B. wanted to see his biological father. In response to the allegations of the petition, Robertson's attorney argued that the drive-by honking incident should not be construed as "stalking." In the trial court's verbal ruling on the record, the court noted that Robertson and Obrecht certainly loved D.B., but based upon the facts and the evidence, the court concluded that the Boudets had established the required elements and granted the request for a plenary order for two years.

¶ 64    Having thoroughly reviewed the record on appeal, we find that there was testimony by all witnesses about interactions amongst the parties dating back before the 2016 adoption; about some of the incidents resulting in both the 2017 and 2019 orders of protection; and about the care provided to D.B. after the adoption. Despite this testimony, the trial court's verbal and written orders made no reference to the 2017 allegations. However, as the trial court may consider "past abuse" as a relevant factor, we do not find that consideration of the 2017 incidents would necessarily have been improper. See 750 ILCS 60/214(c)(1)(i) (West 2018). We conclude that the trial court's plenary order of protection was not contrary to the manifest weight of the evidence.

¶ 65                                    Abuse or Harassment

¶ 66    Robertson finally argues that the allegations of the 2019 order of protection petition, and the evidence adduced at the hearing, do not support the trial court's entry of the plenary order of protection. In particular, he argues that the allegations of abuse and/or harassment were insufficient to warrant entry of the plenary order for two years.

17

¶ 67 To determine if Boudet's allegations of harassment are sufficient to support the trial court's decision to enter the plenary order, we return to the definition of abuse as provided earlier in this order. "Abuse" is defined to include physical abuse and harassment, and "harassment" is further defined to include "knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner." *Id.* § 103(1), (7).

¶ 68 Here Boudet's petition claimed two instances of harassment. The first instance was Robertson's appearance at his place of work shortly after the 2017 plenary order was entered. The second instance was Robertson's alleged drive past the Boudet home while honking his vehicle horn.

¶ 69 Robertson argued that the trial court could not have construed his visit to Murphysboro High School where Boudet worked as abusive. He correctly argues that his visit to Boudet's place of employment did not involve physical abuse. But, as stated previously, the term "abuse" includes harassment. *Id.* § 103(1). Boudet quickly learned of Robertson's appearance. Police were called and were waiting for Robertson upon his return home from the high school. Robertson was charged with a violation of the order of protection and he pled guilty to the charge. At the underlying hearing, the trial court took judicial notice of that conviction. Historically, Robertson's harassment was repeated and difficult for the Boudets and they obtained the 2017 order to stop his behavior. Approximately one month after that 2017 order was entered, Robertson showed up at Boudet's place of work. He testified that he did not remember that Boudet worked there. We find that the timing of the 2017 visit—so close in time to the harassment about which the Boudets sought the first order of protection—was stressful for the Boudet family. Robertson's appearance at the high school, which prompted a call to police either by Boudet or by an administrator at the school, was

18

the equivalent of a "disturbance at petitioner's place of employment," and therefore presumptively caused emotional distress. *Id.* § 103(7)(i). We find that the first incident constituted harassment because Robertson violated the 2017 order of protection.

¶ 70    Robertson's explanation for his presence at Murphysboro High School falls short of rebutting the emotional distress by a preponderance of the evidence. *Id.* § 103. The trial court could have found that Robertson's claim—that he did not remember that Murphysboro High School was where Boudet was employed—was disingenuous. The trial court was in the best position to judge Robertson's credibility. See *Jackson v. Bowers*, 314 Ill. App. 3d 813, 818, 731 N.E.2d 1252 (2000). Regardless of whether the trial court thought that Robertson lied about his lack of knowledge, Robertson's violation of the order of protection by entering the high school "to sign in" his nephew could have been avoided. Robertson could have sent his nephew into the high school alone and/or called an administrator at the high school to explain his inability to enter the building. As Robertson failed to rebut the statutory presumption of Boudet's emotional distress, we confirm that Robertson's behavior in showing up at Boudet's place of employment, in violation of the 2017 order of protection, constituted an act of harassment.

¶ 71    The second incident involves Marcia Boudet's claim that Robertson drove his vehicle by her home while honking his horn. We find that this incident was also disruptive and stressful. Marcia testified that Robertson was the driver of the vehicle in question on February 3, 2019. Robertson does not seem to recall that he had driven by Marcia's home. Obrecht testified that Robertson had taken his vehicle into a shop for repair in early February 2019, and that one route would have taken him past the Boudet home. As stated previously, the trial court had the ability to assess the credibility of the witnesses who testified. *Jackson*, 314 Ill. App. 3d at 818. We also note

19

that the timing of Robertson's purported drive past the Boudets' home could be at issue because the incident occurred a couple of days before the expiration of the 2017 plenary order.

¶ 72    There can be no statutory presumption that the drive-by incident caused emotional distress as there was only one such occurrence. See 750 ILCS 60/103(7) (West 2018). However, the trial court implicitly found, and we agree, that Marcia's testimony established that she had suffered emotionally from the incident. The reason that Marcia experienced such an emotional reaction is tied into the history between the parties and the adoption of D.B. Because Marcia adopted Robertson's son, there is a history involved that cannot be ignored. The connection to Robertson's past harassing behavior coupled with Marcia's concern that D.B. could be emotionally and/or physically harmed, resulted in Marcia's emotional distress. Marcia cannot simply forget Robertson's past harassment and the resulting difficulties experienced by D.B. Robertson's extensive history of harassment and intimidation had a natural impact on Marcia's response to the drive-by incident. Given that history, a reasonable person would suffer emotional distress. See *id*. Furthermore, Marcia did suffer emotional distress. *Id.* We also note that Robertson did not provide any evidence or testimony to rebut Marcia's claims other than his conclusory statement that his action in driving past her home and honking his horn could not reach the level of statutory "abuse."

¶ 73    Robertson cites *In re Marriage of Healy*, 263 Ill. App. 3d 596, 635 N.E.2d 666 (1994), in support of his argument that neither of the incidents fell within the statutory definition of abuse. We have reviewed *Healy* and conclude that while the appellate court in that case reversed the orders of protection, the case does not factually support Robertson's argument. In *Healy*, the wife simultaneously filed a petition for dissolution of marriage and a petition for an emergency order of protection. *Id.* at 596. The trial court granted the petition for an emergency order of protection. *Id.* at 597. The wife alleged that she believed that the husband was a heavy drinker; that she

20

overheard him uttering swear words under his breath on one occasion; that he arrived to pick up the couple's children early in the morning to take them to a golf tournament in Ohio; and that she was fearful that he might have a vehicular accident on that trip. *Id.* at 598, 600. Subsequently, the trial court granted the wife's request for a plenary order of protection to last for the duration of the dissolution case. *Id.* On appeal, the appellate court also reversed the emergency order of protection finding that the wife's allegations were not based on credible evidence of abuse, harassment, or interference with personal liberty. *Id*. at 600. The appellate court reversed the plenary order of protection because the trial court did not comply with the statutory requirement for findings of fact in support of the order. *Id*. at 601 (citing section 214(c)(3) of the Domestic Violence Act of 1986 (750 ILCS 60/214(c)(3) (West Supp. 1993)).

¶ 74 We find that *Healy* is factually distinguishable from this case. In *Healy*, the wife's allegations were conclusory and made without supporting credible evidence. Furthermore, the husband provided contrary evidence regarding her "fears" that he drank excessive amounts of alcohol, and explained that he and the children had gone on the same golf tournament trip in two previous years and thus the "early morning" departure time was not extraordinary. *Id.* at 593. The husband also truthfully acknowledged the allegation that he had used curse words. *Id.* Conversely, the two incidents of harassment listed in Boudet's petition were credible and supported by evidence of Robertson's conviction for violating the 2017 order of protection and testimonial evidence of Marcia's fears and concerns resulting from Robertson's drive past her home.

¶ 75                                             CONCLUSION

¶ 76 Although the presentation of this case was atypical, the primary arguments advanced by Robertson and his attorney at the trial court level (and to a lesser extent at the appellate court level) stem from Robertson's agreement to allow the adoption of his son by the Boudets. The arguments

21

were less focused on the propriety of the trial court's plenary order of protection. Whether Robertson understood the adoption process or whether he changed his mind after the adoption was finalized are not questions before this court. The trial court took judicial notice of the adoption case and documents within that court file confirmed that William and Marcia Boudet are now D.B.'s legal parents. This appeal does not involve the adoption and only involves the propriety of the 2019 plenary order of protection. We find no error in the trial court's ruling on that question. It is also worth noting that, as the trial court stated on the record, the two-year plenary order is "not an eight[-]year order of protection" and "[t]hings may be different down the road."

¶ 77    For the reasons stated in this order, we affirm the judgment of the Jackson County circuit court.

¶ 78    Affirmed.