NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (4th) 210552-U

NOS. 4-21-0552, 4-21-0553, 4-21-0554 cons.

FILED
February 25, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* S.K., J.Y., and R.Y., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County |
|     Petitioner-Appellee, | ) | Nos. 17JA29 |
|     v. | ) |     17JA30 |
| April K., | ) |     18JA48 |
|     Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Thomas E. Little, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's best-interests finding terminating respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    In September 2021, the trial court terminated the parental rights of respondent, April K. (Mother), as to her children, S.K. (born August 12, 2012), J.Y. (born December 29, 2016), and R.Y. (born February 27, 2018). Mother appeals, arguing the court's decision to terminate her parental rights after the court's best-interests determination was against the manifest weight of the evidence. We affirm.

¶ 3                  I. BACKGROUND

¶ 4                 A. Initial Proceedings

¶ 5                                    1. *S.K. and J.Y.*

¶ 6            On February 27, 2017, the State filed petitions for adjudications of wardship with respect to S.K. (Macon County case No. 17-JA-29) and J.Y. (Macon County case No. 17-JA-30). The petitions alleged the minors were neglected pursuant to sections 2-3(1)(a) and (b) of the Juvenile Court Act of 1987 (Juvenile Act) (705 ILCS 405/2-3(1)(a), (b) (West 2016)) because the children were not receiving the proper or necessary care as required by law, and their environment was injurious to their welfare. The State's petitions also alleged S.K. and J.Y. were abused pursuant to section 2-3(2)(ii) of the Juvenile Act (705 ILCS 405/2-3(2)(ii) (West 2016)) because their parent and/or others created a substantial risk of physical injury to the minors by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function. Specifically, the petitions claimed the family was homeless and Mother had "substance abuse and domestic violence issues in the presence of the children." A shelter care report filed that same day indicated the minors were taken into protective custody by the Illinois Department of Children and Family Services (DCFS) on February 23, 2017, after Mother was found "smoking [methamphetamine] with [S.K.] and [J.Y.] present." Over the course of the subsequent investigation, Mother was "combative *** and would not cooperate with the department on the safety and well-being of the children." Mother indicated she was homeless but denied any substance abuse. However, the report stated Mother was "working with homeward bound, to obtain housing, but [was] kicked out of the program due to positive drug screens." Mother's drug screen results indicated she tested positive for cannabis, cocaine, and amphetamines on October 27, 2016, and tested positive for cannabis and amphetamines on December 6, 2016, and December 12, 2016.

¶ 7        In May 2017, the trial court entered an adjudicatory order finding S.K. and J.Y. neglected. Also in May 2017, the court entered a dispositional order (1) finding Mother unfit and unable to care for, protect, train, or discipline S.K. and J.Y.; (2) making the minors wards of the court; and (3) placing custody and guardianship with DCFS.

¶ 8                                        2. *R.Y.*

¶ 9        In March 2018, the State filed a petition for adjudication of wardship with respect to R.Y. (Macon County case No. 18-JA-48). The petition alleged the minor was neglected pursuant to section 2-3(1)(b) of the Juvenile Act (705 ILCS 405/2-3(1)(b) (West 2016)) because R.Y.'s environment was injurious to his welfare. The State's petition further alleged R.Y. was abused pursuant to section 2-3(2)(ii) of the Juvenile Act (705 ILCS 405/2-3(2)(ii) (West 2016)) because his parent and/or others created a substantial risk of physical injury to the minor by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function. Specifically, the petition claimed Mother had not "demonstrated a substantial period of sobriety, and unstable housing remains an issue."

¶ 10        On October 11, 2019, the trial court entered an adjudicatory order finding R.Y. neglected and in substantial risk of being physically abused due to Mother's persistent substance abuse and ongoing problems with domestic violence. That same day, the court entered a dispositional order finding Mother unfit and unable, for reasons other than financial circumstances alone, to care for, protect, train, or discipline R.Y., and the best interests of the minor would be jeopardized if he remained in the custody of Mother. The court adjudged R.Y. neglected and abused, made him a ward of the court, and placed custody and guardianship with DCFS.

¶ 11                          B. Termination Proceedings

¶ 12          In July 2020, the State filed petitions to terminate Mother's parental rights. The

petitions alleged Mother failed to (1) make reasonable efforts to correct the conditions which

were the basis of removal of S.K., J.Y., and R.Y. from her within nine months after adjudication

(750 ILCS 50/1(D)(m)(i) (West 2016)) and (2) make reasonable and substantial progress toward

the return of the minors within nine months after adjudication, specifically May 11, 2017, to

February 11, 2018; February 11, 2018, to November 11, 2018; November 11, 2018, to August

11, 2019; August 11, 2019, to May 11, 2020; and October 13, 2019, to July 13, 2020 (750 ILCS

50/1(D)(m)(ii) (West 2016)).

¶ 13                              1. *Fitness Hearing*

¶ 14          In April 2021, the trial court conducted a bifurcated hearing on the petitions for

termination of parental rights, first considering Mother's fitness. At the hearing, Mother

stipulated she failed to make reasonable and substantial progress toward the return of S.K., J.Y.,

and R.Y. within nine months after adjudication, specifically October 13, 2019, to July 13, 2020

(750 ILCS 50/1(D)(m)(ii) (West 2016)). Based on Mother's stipulation, the court found Mother

unfit by clear and convincing evidence.

¶ 15                          2. *Best-Interests Hearing*

¶ 16          On September 20, 2021, DCFS submitted a written best-interests report indicating

Mother initially "displayed efforts towards engagement in services and in visits with her

children. However, as time progressed, it became apparent [Mother] failed to see the significance

of putting her children's well-being above he[r] own needs and desires." The report further

indicated Mother "failed to take guidance and suggestions of service providers as it related to

improving her visitation and her relationship with her children," which "resulted in DCFS never

moving forward with discretion for [Mother's] visits with her children." Mother also "displayed unsafe behaviors during supervised visitation *** and made efforts to triangulate service providers when efforts were made to assist her in improving her relationship and visits with her children." In February 2021, "a critical decision was made to suspend [Mother's] visitation with [S.K.]"

¶ 17        According to the report, the foster parents met the minors' physical safety and welfare needs, including food, shelter, clothing, emotional attachment, love, and sense of belonging. The minors had a strong bond with their foster parents, showed them affection, and sought them out to meet their needs, which was "evidenced by [S.K.], [J.Y.], and [R.Y.] displaying no fear of their caregivers and the affection they show during [the child welfare specialist's] visits to the home."

¶ 18        At the September 23, 2021, best-interests hearing, Kindra Smith, a DCFS caseworker, testified she had been assigned Mother's cases since 2018. Smith testified all the minors' needs were met in the foster home. Smith observed the minors in the home and saw their interactions with the foster parents. With respect to S.K., Smith stated, "this has been the most stabilized placement that he's been in. He feels secure. He's [*sic*] feels safe. He's grown extremely close to the Thompsons and sees them as his parents as well as their biological children; he sees them as his siblings." Smith testified S.K. "expressed that he does not want to go back with [Mother] and desires to be and remain with the Thompsons." Smith further testified J.Y. and R.Y. were "very bonded" to their foster parents and had strong attachments to them. Smith believed it was in the minors' best interests for Mother's parental rights to be terminated and explained:

"These children have remained in this placement for a significant amount of time. They have grown to love the Thompsons and view them as their parents. They feel safe and secure with them. It's their structured home. They provide them all their needs that they need whether it's medical, mental, physical. They also are involved in the community activities, very supportive of their educational goals."

During cross-examination, Smith testified she had "very little to no contact" with Mother since September 2020. Smith further testified Mother struck J.Y. during a supervised visit in June 2019, after becoming verbally aggressive and frustrated. Mother also struck R.Y. in the mouth during a visit with the children in December 2019. Following a visit with Mother in November 2020, S.K. pulled a tooth out of his mouth after Mother made statements to S.K. "regarding him being returned home and also a conversation with him about his father who he has *** never met and saying that [S.K.] was going to start having visits with him."

¶ 19        Stepheni Hall, the court-appointed special advocate (CASA), testified she engaged with Mother, and Mother "was very consistent until like the last three months." Hall testified she observed visits between Mother and the children. R.Y. and J.Y. "always would be glad to see her *** and call her 'mama' and interact." However, S.K. "wanted to leave a lot of the time," and Hall acknowledged "the relationship with [S.K.] and his mother is strained; and that he doesn't feel comfortable; that he *** just doesn't want to be there. He doesn't feel—he's fearful for his *** safety." Hall further acknowledged Mother "went to jail for domestic violence" in March 2021, and she "just got out of jail at 9 o'clock last night" in relation to a subsequent domestic violence incident.

¶ 20        Rachel Davis, a correctional officer for the Macon County jail, testified she encountered Mother on September 19, 2021, after receiving a "phone call from dispatch that Decatur Police were bringing a female in, straight in, combative." Mother was "covered in a layer of perspiration, unkept [*sic*], and had a strong odor of alcoholic beverage." Davis stated Mother "yelled for approximately 30, 45 minutes, and then she wrapped herself up in a mattress and went to sleep ***." Davis attempted to process Mother three different times during her shift, "and all three times, [Mother] would wake up, scream at us, cuss at us, and then never even unwrapped herself from the mat."

¶ 21        After hearing the evidence, the trial court gave a detailed ruling where it first acknowledged consideration and weighing of the statutory best-interests factors, labeling the most pertinent and applicable factors as "the children's sense of attachment where they actually feel love, a sense of being valued, their sense of security, their sense of familiarity, continuity, and the least disruptive placement alternative for the children." The court then reviewed the written best-interests report and oral testimony, highlighting the following: the minors considered their current placement their home and referred to their foster parents as "mom and dad"; all three children had strong attachments to their foster parents; "the older two have been placed continuously in the *** foster home since December 2018 with the younger child, [R.Y.], joining them in May of 2019"; and the foster parents not only met the children's basic needs for food, clothing, and shelter, but also provided for their safety and gave them a sense of belonging. The court noted J.Y. and R.Y. were "on track developmentally" and considered S.K.'s desire for "the court proceeding to be finished so he can *** 'feel like a normal kid.' " As for the minors' needs for stability and continuity of relationships with parent figures, the court noted the foster parents were supportive of the children's physical, emotional, and educational needs. Ultimately,

the court concluded the State proved by a preponderance of the evidence it was in S.K.'s, J.Y.'s, and R.Y.'s best interests Mother's parental rights be terminated.

¶ 22    This appeal followed.

¶ 23                    II. ANALYSIS

¶ 24    On appeal, Mother argues the trial court erroneously terminated her parental rights. Specifically, she alleges the court's best-interests determination was against the manifest weight of the evidence.

¶ 25    The Juvenile Act (705 ILCS 405/1-1 *et seq.* (West 2020)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2020)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494, 777 N.E.2d 930, 940 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show the parent is an "unfit person," and then the State must show terminating parental rights serves the best interests of the child. *D.F.*, 201 Ill. 2d at 494-95 (citing 750 ILCS 50/1(D) (West 1998) and 705 ILCS 405/2-29(2) (West 1998)). Here, Mother does not challenge the trial court's unfitness finding, having instead stipulated to the sufficiency of the State's evidence to establish her unfitness. Rather, she challenges the trial court's determination at the second step only—the best-interests step—maintaining the trial court erred. We disagree.

¶ 26    Once a trial court finds a parent an "unfit person," it must next consider whether terminating that person's parental rights serves the child's best interests. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the

best interests of the child"). When considering whether termination is in a child's best interests, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2020). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child."
> *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.3d 123, 141 (2006).

See also 705 ILCS 405/1-3(4.05) (West 2020).

¶ 27 A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

- 9 -

¶ 28　　　　Mother contends the trial court's best-interests determination goes against the manifest weight of the evidence because "the testimony clearly showed that [Mother's] bonding with her children was hindered by the foster parents." Mother further submits "it would be in the best interests of the children to grow up with their mother who loves them and [has] fought so hard for them." To the contrary, the trial court weighed the relevant statutory best-interests factors, considered the testimony presented along with the information contained in the best-interests report, and properly determined the factors weighed in favor of terminating Mother's parental rights.

¶ 29　　　　Through testimony from S.K.'s, J.Y.'s, and R.Y.'s current caseworker, Smith, the State presented the trial court with the following evidence of the minors' best interests: the children have remained in the same foster home for a significant amount of time and "have grown to love [their foster parents] and view them as their parents"; the minors felt "safe and secure" in their current placement, and it "has been the most stabilized placement that [S.K.'s] been in"; S.K. also "expressed that he does not want to go back with [Mother]" and desired to remain with his foster family; J.Y. and R.Y. were "very bonded" to their foster parents and had strong attachments to them; and the foster parents provided for all of the minors' needs, "whether it's medical, mental, [or] physical," and were "very supportive of their educational goals." Smith opined terminating Mother's parental rights would be in the minors' best interests. Smith explained she had "very little to no contact" with Mother since September 2020. Smith also testified Mother struck J.Y. during a supervised visit in June 2019 and she struck R.Y. in the mouth during a visit with the children in December 2019. Following a visit with Mother in November 2020, S.K. pulled a tooth out of his mouth after Mother made statements to S.K. "regarding him being returned home and also a conversation with him about his father who he

has \*\*\* never met and saying that [S.K.] was going to start having visits with him." Further, the CASA recognized "the relationship with [S.K.] and his mother is strained," noting he was fearful for his own safety when around her. The CASA also acknowledged Mother "just got out of jail" one evening prior to the best-interests hearing due to another domestic violence incident.

¶ 30 The trial court noted it considered the relevant statutory best-interests factors. Identifying the children's sense of attachments as particularly relevant, the court referenced how the evidence showed S.K., J.Y., and R.Y. were secure in the foster home and shared a sense of familiarity with their foster parents. The minors considered their current placement their home and referred to their foster parents as "mom and dad." All three children had strong attachments to their foster parents. The court also considered the minors' need for permanence, stating, "the older two have been placed continuously in the \*\*\* foster home since December 2018 with the younger child, [R.Y.], joining them in May of 2019." The court said the evidence showed the foster parents not only met the children's basic needs for food, clothing, and shelter, but also provided for their physical safety and gave them a sense of belonging. Next, the court considered the wishes of the children as well as their long-term goals, and it determined J.Y. and R.Y. were "on track developmentally." The court also considered S.K.'s desire for "the court proceeding to be finished so he can \*\*\* 'feel like a normal kid.' " As for the minors' needs for stability and continuity of relationships with parent figures, the court noted the foster parents were supportive of the children's physical, emotional, and educational needs.

¶ 31 All told, the evidence in this record supports the trial court's decision that terminating Mother's parental rights served S.K.'s, J.Y.'s, and R.Y.'s best interests, meaning the decision is neither unreasonable nor arbitrary. See *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16. Mother has failed to identify any relevant evidence in this record which would support an

opposite conclusion under our standard of review. Since the evidence does not lead us clearly to the opposite conclusion, we cannot say the trial court's best-interests determination goes against the manifest weight of the evidence. *Keyon R.*, 2017 IL App (2d) 160657, ¶ 16.

¶ 32                                III. CONCLUSION

¶ 33          For the reasons stated, we affirm the trial court's judgment.

¶ 34          Affirmed.