NOTICE
Decision filed 08/30/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 230080-U

NO. 5-23-0080

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| TONIA GIBSON, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Massac County. |
| | ) | |
| v. | ) | No. 22-OP-11 |
| | ) | |
| THOMAS R. RUNKLE, | ) | Honorable |
| | ) | Sarah Tripp, |
| Respondent-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Cates and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the judgment of the circuit court granting a plenary order of protection where the circuit court's findings were not against the manifest weight of the evidence and the record demonstrates that the circuit court considered the required relevant statutory factors.

¶ 2    This action comes before this court upon a grant of a plenary order of protection (OP) sought by the petitioner, Tonia Gibson, against the respondent, Thomas R. Runkel. The circuit court issued the OP on January 23, 2023, and the OP was filed on February 6, 2023. This appeal followed. For the following reasons, we affirm the judgment of the circuit court of Massac County.

¶ 3                                    I. BACKGROUND

¶ 4    On March 21, 2022, the petitioner filed a petition seeking an emergency order of protection (EOP) in the circuit court of Massac County. The petition alleged that the petitioner and the

1

respondent were in a dating relationship and that the following incident[1] had occurred on March 17, 2022.

"[The respondent] and I went for a ride on the side-by-side,[2] and [the respondent] was driving erratically. I told him he was making me nervous and I asked him to get back onto the road and slow down. This made him mad. When we got back to the house I started to get my belongings together. [The respondent] got mad when he realized I was trying to leave and he started throwing my belongings out of the house. I grabbed my overnight bag, my purse, and my phone and started walking out to my car.

As I was walking to the car, I put my phone in my pocket and started recording on my phone because I knew he was angry. He followed me out and started fighting me for my car keys. He started hitting me with an open hand in the back of my head. He grabbed me by my shirt and then grabbed me by my throat. When he was doing this, I managed to kick him with my left leg to get him away but he grabbed me by my hair and drug me out of the car. I ended up laying about five feet from the car and he started stomping on my right arm (fractured arm in two places and dislocated elbow). [The respondent] started kicking me in my side and in my chest (3 broken ribs). I grabbed my keys again and he called me a cunt and said, 'if you think you're leaving me, I will kill you and put you in the cistern out back and no one will ever find you.' [The respondent] told me his face would be the last I ever see and no one would care that I was gone.

---

[1]In the petition, the incident is provided in a continuous narrative without paragraphing. Due to its length, we are utilizing paragraphs to assist in the reading of the quote.

[2]A "side-by-side" is a term that is commonly used to refer to an all-terrain vehicle with two or more seats positioned similar to that of a car or truck and enclosed with a roll cage structure.

He continued beating me up and he strangled me at one point. I believe I blacked out because when I came to [the respondent] told me he would kill me if I did not get in the house. When I got back to the house, I told him I was hurt and needed to go to the hospital. I told him if he would let me go, I would tell them it was a 4-wheeler accident and promised not to tell anyone what he did to me. He pulled out a 20-guage shotgun, put a bullet in it, and over the next hour he threatened me with it. [The respondent] sat me down in the kitchen and threatened to shoot me.

[The respondent] pulled what was left of my shirt (he ripped most of it) over my face where it was covering my mouth and nose and started to pour beer on top of the shirt that was covering my mouth and nose. I could not breath. He then grabbed me by my hair again and told me to stand up. He picked up the shotgun and said I was giong [*sic*] to watch and see how serious he was. I stood next to him, he was still holding my hair, he pointed the gun out the patio door and pulled the trigger. At one point he put the gun in his mouth, he told me to pull the trigger because it was the only way I'd be leaving alive. He did this four times, he also held the gun to his chest.

He walked out to his truck and got in the center console. I was watching and knew this was where he kept his loaded pistol. I knew this was my only chance to escape. I snuck out the back door, hid behind a tree, and then took off running toward my neighbor's house through the trees. I could hear him following me on the side-by-side as I was running. Once I got to my neighbor's I was able to call the police.

I have 3 broken ribs; a black eye; my arm is fractured in two places; a dislocated shoulder, and multiple bumps and bruises all over my body. I do not remember at what

3

point, but [the respondent] also bit me on my left wrist and broke the skin. There is a full imprint of his teeth marks from this.

When he took my phone, he said it would not do any good to call for help because he is a Mason and no one will do anything to him. I am unsure how much of this incident recorded on my phone and I do not know if it's still on my phone because he took my phone from me. (I have since been able to obtain my belongings. My son went to get them from [the respondent's] house Saturday.)"

¶ 5    The petition also stated that the following incident occurred in late December:

"I told [the respondent] I was getting my things and leaving. He shoved me backwards into our dining room table, grabbed my face, and started calling me a cunt and a whore. He threw my stuff into the yard and held me in his house for almost 45 minutes and wouldn't let me leave. [The respondent] also threatened to shoot my cat.

Throughout the three or four breakups we have had, [the respondent] becomes verbally and physically abusive. He calls me names such as a cunt, whore, and a bitch. He harasses my family. [The respondent] has told me multiple times he would kill me. He has a drinking problem. I am afraid of [the respondent], and I am afraid if I don't get an order of protection, he will kill me."

¶ 6    The circuit court conducted a hearing on the petition the same day, March 21, 2022. The circuit court noted that the respondent had not been provided notice of the hearing and, as such, the petitioner was the only party present at the hearing accompanied by an unidentified victim advocate. The petitioner was duly sworn and questioned by the circuit court. In the interest of brevity, we will only set forth the differentiations in the petitioner's testimony from the narrative quoted above.

4

¶ 7     At the hearing, the petitioner stated that when the respondent pulled her from her car, the respondent "stomped" on her chest, causing a fractured sternum. When testifying about the shotgun, the petitioner stated that the respondent "was hitting me in the chest with the butt of the gun." The petitioner also stated that the respondent had said that he was not going to jail "for—to be a wife beater again, is what he said."

¶ 8     The petitioner further testified that, after hiding by the trees, she ran to a neighbor's house and once inside, she could hear the respondent on the side-by-side "circling around their house, but they didn't let him in." The petitioner testified that once her phone was returned to her, there was no recording concerning the incident so either the respondent had deleted it, or she had not hit the record function as she thought she had. The petitioner then stated that, "Oh, I forgot to tell him about when I got—when he chased me down in the woods in the car and hit me, my leg." After hearing the petitioner's testimony, the circuit court granted an EOP effective until April 6, 2022, and advised the petitioner to bring any other witnesses, documents, photographs, videos, or any other evidence that would support her claim to the next hearing date.

¶ 9     The EOP was extended several times for various reasons and a plenary hearing was finally conducted on January 23, 2023. The petitioner was present at the hearing, *pro se*, and the respondent was present and represented by counsel. The first witness to testify was the petitioner. Again, in the interest of brevity, we will only set forth any differentiations in the petitioner's testimony from the narrative contained in the petition and/or her prior testimony at the EOP hearing.

¶ 10    The petitioner testified that while she and the respondent were riding in the side-by-side, they entered somebody's private property and "[w]e had stopped and closed the gate close to the road, got outside and he actually urinated on my feet and my leg." The petitioner stated that when

5

she was attempting to leave the petitioner's home, she had her phone and was going to call "the sheriff's department or my brother, one or the other, and leave it on speaker because I knew something was going to happen." The petitioner also stated that after the respondent pulled her from her car, "he threw me, I went face down and my arm dislocated, broke my arm, my elbow, and he proceeded to kick me at this time in the ribs, stomp me on the back, kicked me in the crotch and just kept continually kicking me."

¶ 11    The petitioner stated that after being kicked, she took off through the woods, that the respondent had gotten into her vehicle, and that he "had come down the hill in my own car and tried to run over me and he did nick me in the shin area." The petitioner stated that it was not easy to remember, "because from there he just drug me, I was on the ground again and he was kicking me and stomping me again." The petitioner stated that the respondent then dragged her into the house and refused to get her medical treatment. With regard to the shotgun, the petitioner stated that the respondent took her to the back door in the kitchen, opened the door, and shot the shotgun beside her head. The petitioner then testified that the respondent discharged the shotgun again, so she assumed it contained only two shells since that is when the respondent went outside to his vehicle.

¶ 12    With regard to her escape, the petitioner testified that she "snuck out the back door and slid off the carport, hid behind a tree until I seen him go in [the house]." The petitioner then stated that she ran to the neighbor's house, and they called 911. The petitioner also stated that her neighbor's daughter was there and "came up and said she had seen the same thing go on with [the respondent's] previous ex-wife."

¶ 13    On cross-examination, the petitioner admitted that she had failed to put in the petition the part about running through the woods and the respondent chasing or hitting her with a vehicle. The

6

petitioner also admitted that she had not included the allegation that the respondent had urinated on her. The petitioner testified that she did not think of those things when she was initially reporting the incident, and that "there is a lot of things that did come back after time and there is some things that you don't remember."

¶ 14    Counsel for the respondent then questioned the petitioner regarding her medical records related to the incident. The petitioner testified that, although she had received a copy of the medical records on a disc, she "didn't review them at all," since she did not own a disc player. Counsel for the respondent then questioned the petitioner regarding her medical records that, according to the respondent's counsel, indicated that the petitioner had suffered a dislocated elbow, but also demonstrated that there was no fracture to the petitioner's ribs, no broken ribs, no broken arm, and no dislocated shoulder as stated in the petition and/or the petitioner's previous testimony.[3] The petitioner responded that "[m]y discharge papers right here states that I have multiple bruises, broken arm, fractured ribs." The petitioner then asked the circuit court, "Would it be okay if I gave you the discharge paper and these papers?" The circuit court instructed the petitioner to allow the respondent's counsel to finish her questioning.

¶ 15    The respondent's counsel continued questioning the petitioner as follows:

"Q. Well, because isn't it true that that's actually what happened, you fell out of the side by side while the two of you were out?

A. Absolutely not.

Q. And you fell out, because you were the passenger, and you fell to the right and landed on your elbow?

_____

[3]Respondent's Exhibit 2 is a copy of the petitioner's medical records from Baptist Health concerning the treatment the petitioner received on March 17, 2022. The records state that the petitioner had a dislocated right elbow, which was reduced without difficulty, and the final diagnoses was domestic violence of adult, initial encounter; multiple contusions; closed nondisplaced fracture of the right radius, initial encounter; and closed fracture of one rib on right side, initial encounter.

7

A. Absolutely not.

Q. And isn't that how you injured your elbow?

A. No, my elbow got broken by being thrown out of the car and him stomp on it face down on the ground."

¶ 16    The petitioner testified that she had no idea of the time span of the incident, and that she was not aware that the 911 call was made at 9:17 p.m. because she did not make the call herself. The respondent's counsel completed her examination and the petitioner again requested that she be allowed to admit the discharge paper that "shows my arm was broken." Counsel for the respondent objected, stating that the petitioner had the disc containing the medical records and that the medical records contained on the disc would be a more accurate depiction of the petitioner's medical treatment as opposed to a discharge summary that the petitioner claims she obtained from the hospital. Over the respondent's objection, the circuit court admitted the petitioner's discharge summary as petitioner's exhibit 1. Petitioner's exhibit 1 was an after-visit summary from Baptist Health, and the diagnoses listed on the summary was domestic violence of an adult, multiple bruises, broken arm, and closed fracture of one rib on the right side. The petitioner indicated that she had no witnesses or any additional evidence to offer.

¶ 17    The respondent then called Officer Mark Stram with the Illinois State Police. Officer Stram testified that he was familiar with the respondent and had been neighbors with him for 15 years. Officer Stram stated that he had met the petitioner on a few occasions when she was with the respondent. Officer Stram testified that he had spoken with the respondent a few times in the past about the problems that the respondent was having with the petitioner. Officer Stram testified that the respondent had stated that the petitioner would get intoxicated and would hit him. Officer Stram testified that his advice to the respondent was always the same, "call the police and leave." On cross-examination by the petitioner, Officer Stram stated that he had never been called to the

8

respondent's house, nor had he spoken to the petitioner individually for any reason. Officer Stram also could not state the exact date that the respondent had called him and alleged that the petitioner was intoxicated and hitting the respondent.

¶ 18    Next, the respondent called Judy Runkle. Judy testified that she was the respondent's former spouse, and that they had been married for 20 years. Judy stated that during that time, the respondent had never physically attacked her, hit her, grabbed her by the throat, pulled her hair, or "stomped on her." On cross-examination, Judy testified that she had never filed charges for domestic battery against the respondent and had never called someone to the residence because of the respondent's anger or physical actions.

¶ 19    The respondent then called Glenn Faith to testify. Glenn stated that he knew the respondent and had met the petitioner once or twice. Glenn testified that he was a retired investigator with the Secretary of State Police and was somewhat familiar with the incident that occurred on March 17, 2022. Glenn stated that he was instructing at a training event when his wife called him at approximately 9 p.m. on March 17, 2022. Glenn stated that his wife had asked him to come home because the respondent was there and that something had happened.

¶ 20    Glenn testified that he arrived home at approximately 10 p.m. to 10:30 p.m. and observed the respondent with a black eye. Glenn testified that the respondent had stated that he and the petitioner had been out on the side-by-side and that something had hit the respondent in the eye or that the petitioner had hit the respondent in the eye. Glenn stated that he was not really clear on what had happened regarding the respondent's eye, but that the respondent had stated that "he pulled away and felt like [the petitioner] had been thrown or fell out of the side by side." Glenn stated that he and the respondent had not talked a lot about the incident that evening since there were teenage children present at the house. Glenn testified that the respondent had spent the night

9

at his house and that Glenn knew that the respondent had come to Glenn's house to try and disengage from whatever the problem was with the petitioner. The respondent's counsel handed Glenn a "Google map," and Glenn stated that the map indicated it was 12.4 miles from the respondent's residence to Glenn's residence. Glenn testified that it usually took him 20 to 25 minutes to drive from his home to the respondent's residence.

¶ 21    Glenn went on to state that the next morning, he told the respondent that the respondent needed to "get out in front of this thing," by going to the sheriff's department and making a statement. Glenn testified that both he and the respondent went to the sheriff's office and gave statements; however, they had stopped by the respondent's house first. At the respondent's house, Glenn stated that he observed the side-by-side and that there were nine Bud Light beer cans and two green cans of beer in the back portion of the side-by-side. Glenn estimated that if someone fell out of the respondent's side-by-side, it would be approximately 12 to 14 inches to the ground.

¶ 22    Glenn further testified that he was familiar with the respondent's residence. Glenn stated that if someone were to jump over the back railing of the porch, it would probably be six feet down to the ground. Glenn described the respondent's driveway as "a winding driveway fairly steep, goes down, there is a little park area off to the right. If you went to the right, you'd go down into the carport." Glenn also testified that there were woods to the right of the driveway and a grassy area to the left of the driveway. Glenn stated that the respondent's backyard was "heavily wooded," and an all-terrain vehicle was needed to get down to that area.

¶ 23    On cross-examination, Glenn stated that he had observed the beer cans in the side-by-side the next day, but that he could not state when the beer cans had been placed in the side-by-side. Glenn also acknowledged that the respondent had stated that the petitioner had fallen out of the side-by-side, and that it was an accident. The petitioner next questioned Glenn as follows:

10

"Q. My question in your opinion if it was an accident and I just go back out as he told you, regardless, would need to call 911 or put me in the vehicle and took me to the hospital; wouldn't most normal people have done that?

A. Well I don't know what happened, so I don't—I can't really have an opinion about what he could or should have done that evening.

Q. But wouldn't you assume that if say his story was correct and somebody, a passenger fell out, if you were in that situation, would you not call 911 or put them in the hospital if they are able to be transported in the vehicle?

* * *

A. Depended on the situation. I mean my son turned over our side by side and we didn't call anyone.

Q. If you thought he needed medical attention and his arm was dangling, would you not—

A. If, if my son would have been injured, then I would have, yes.

Q. Would you go to a friend's house and say, tell him about the incident or would you get that person some treatment?

A. If my son was injured, I would have handled it there immediately."

¶ 24 The next witness called by the respondent was Felicia Faith. Felicia testified that she is married to Glenn Faith, that she knew the respondent, and that she had met the petitioner once or twice. Felicia stated that on the evening of March 17, 2022, the respondent came to Faith's home while she was having dinner with her children. Felicia testified that the respondent had a black eye and that the respondent had stated that the petitioner had hit him in the eye. Felicia testified that she did not know the approximate time that the respondent arrived, only that it was dark outside.

¶ 25 Felicia stated that initially, the respondent had not said anything regarding the incident since she and her children were finishing their dinner and her children had friends over. Felicia stated that the respondent "started telling the story" once the children went downstairs and that at 9 p.m. she telephoned her husband. Felicia testified that the respondent had been at the house for

11

"a while" when she had called her husband but could not testify that he arrived at any specific time. On cross-examination, Felicia testified that the respondent had a black eye, but could only state what the respondent had told her happened to his eye.

¶ 26    Finally, the respondent recalled the petitioner to the stand. The petitioner testified that she believed that the neighbor had called 911 and not a specific law enforcement office, and that she did not know the exact time of the call. The petitioner was handed a Massac County Sheriff's Deputy's Office Report which indicated 9:17 p.m. as the time that the 911 call was received by law enforcement. The petitioner agreed that it appeared that the 911 call was made at that time.

¶ 27    The following exhibits were admitted[4] by the circuit court:

Petitioner's Exhibit 1: a copy of the petitioner's Baptist Health discharge summary printed at 3:25 a.m. on March 18, 2022.

Respondent's Exhibit 1: petition for order of protection.

Respondent's Exhibit 2: petitioner's medical records from Baptist Health.

Respondent's Exhibit 3: Google map indicating distance between the respondent's and the Faiths' residences.

Respondent's Exhibits 4-11: Photographs of the respondent, the side-by-side, and the respondent's residence.

Respondent's Exhibit 12: Google Earth photograph of the respondent's residence.

Respondent's Exhibit 13: Photograph of the grassy area to the left of the respondent's residence.

No Respondent's Exhibit 14.

Respondent's Exhibit 15: Massac County Sheriff's Department incident report, case No. 22-146, reported date of March 17, 2022.

---

[4]The petitioner offered photographs that were reviewed by the circuit court and the respondent's counsel. The circuit court indicated that the photographs would be marked as petitioner's exhibit 2; however, the photographs were never admitted by circuit court and are not contained in the record on appeal.

¶ 28    Respondent's Exhibit 15, the Massac County Sheriff's Department incident report (incident report), contained numerous photographs of the petitioner's injuries taken at the hospital on the night of the incident, photographs of the respondent's residence, and photographs of the respondent's side-by-side. The incident report also contained the summaries of the audio statements given to law enforcement by the petitioner on March 17, 2022, and March 18, 2022.

¶ 29    The incident report further contained a summary of the respondent's interview by law enforcement on March 18, 2022. According to the summary of the respondent's interview, the respondent stated to law enforcement that the petitioner was intoxicated, upset, and arguing with the respondent while they were riding in the side-by-side. The respondent stated that something glanced off his right arm and struck him in the face causing him to jerk the steering wheel and drive the side-by-side into a ditch. The respondent stated that he then noticed that the petitioner had fallen out of the side-by-side and was complaining about her arm hurting. The respondent stated that he assisted the petitioner back into the side-by-side, drove both of them back to the house, and since the petitioner was still arguing with him, left to get away from the petitioner and went to the home of Glenn Faith.

¶ 30    Both parties made closing arguments and the circuit court took the matter under advisement. At 1:17 p.m. on January 23, 2023, the circuit court made the following docket entry:

"1:17PM: Matter was taken under advisement. Upon review of all exhibits, Court notes that P's #2 (photos) were not handed back to the Court when counsel for Respondent had concluded reviewing same. Court did review photos at the time of the hearing. Upon further consideration, Court has considered the verified petition, testimony of all witnesses, exhibits and arguments presented by both parties. Court finds that Petitioner has met her burden by a preponderance of the evidence. Plenary Order to Enter. Court directs [victim

13

advocate] to prepare plenary order and submit to the Court. EOP shall remain in effect until entry of Plenary OP."

¶ 31 On February 6, 2023, the circuit court filed a 14-page written order granting the OP utilizing form OP-P 405.3, which is a standardized form approved by the Illinois Supreme Court.[5] Of relevance to the respondent's arguments on appeal, in paragraph 3 of the OP, the circuit court checked both boxes that its findings were stated on "page 11 and 12 of this *Order*, OR" and "[w]ere made orally and videotaped or recorded by a court reporter and are incorporated into this *Order*." (Italics in original.)

¶ 32 Paragraph 5 on page 11 of the OP states as follows:

"In granting the remedies of this *Order*, the Court has considered all relevant factors, including: the nature, frequency, severity, pattern, and consequences of Respondent's past abuse, neglect, or exploitation of Petitioner *** and the likelihood of danger of future abuse, neglect, or exploitation to Petitioner or any member of Petitioner's or Respondent's family or household ***. The Court finds that:

* * *

* Respondent has abused Petitioner and/or *** the Protected Persons listed on Page 1 of this *Order*.

* The actions of Respondent will likely cause irreparable harm or continued abuse unless they are prohibited.

* It is necessary to grant the requested relief in this *Order* to protect Petitioner or other abused persons." (Italics in original.)

---

[5]OP-P 405.3 was approved by the Illinois Supreme Court in August 2021 and is required to be accepted in all Illinois circuit courts. See www.illinoiscourts.gov/forms/approved-forms/forms-approved-forms-circuit-court/order-of-protection (last visited Aug. 16, 2023).

Paragraph 5 does not contain any boxes for the circuit court to check. Paragraph 7 on page 12 of the OP, however, has a box next to "Civil Cases," which was checked by the circuit court. Paragraph 7 sets forth the exact same wording as paragraph 5; however, the word "prohibited" is missing and, as such, the sentence reads that "The actions of Respondent will likely cause irreparable harm or continued abuse unless they are[.]"

¶ 33    The circuit court issued the OP on January 23, 2023, with a termination date of January 22, 2025. The OP was filed on February 6, 2023, and this appeal followed. On appeal, the respondent argues that the circuit court's granting of the OP was against the manifest weight of the evidence. The respondent also argues that the circuit court's findings do not meet the mandatory standards of section 214(c)(3) of the Illinois Domestic Violence Act of 1986 (Act) (750 ILCS 60/214(c)(3) (West 2022)).

¶ 34                                              II. ANALYSIS

¶ 35    Before proceeding with our analysis, we note that no appellee brief has been filed in this matter. If justice requires, and the record is simple and the claimed errors are such that this court can easily decide them without the aid of an appellee brief, we will decide the merits of the appeal and do so in this matter. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976). This court will not, however, serve as an advocate for the appellee or search the record for the purpose of sustaining the judgment of the circuit court. *Id.*

¶ 36    The respondent first argues that the circuit court's granting of the OP was against the manifest weight of the evidence. The respondent argues that the petitioner's testimony was "untruthful" since the petitioner was inconsistent in her various statements and/or testimony regarding the manner of the attack. The respondent notes that the petitioner added allegations of being chased through the woods, hit by a car, and urinated on that were not included in the petition

15

or in her statements to law enforcement. The respondent further states that the petitioner told several versions about running to the neighbor's home—one that stated the respondent followed her in the side-by-side, one that stated the respondent followed her in a vehicle, and at the plenary hearing, no testimony about being chased while running to the neighbor's house. The respondent also argues that the petitioner made numerous inconsistent statements and/or testimony regarding the injuries she had sustained. The respondent states that the petitioner "lied" to the circuit court about her injuries and that the medical evidence did not support the petitioner's multiple claims of physical abuse alleged to have been inflicted by the respondent.

¶ 37    The respondent further asserts that his statement to law enforcement was not considered by the circuit court and that the testimony of the respondent's witnesses proved that the respondent was not around the petitioner "several minutes" before the 911 call was made. As such, the respondent argues that the circuit court's granting of the OP was against the manifest weight of the evidence.

¶ 38    The central issue in an order of protection proceeding is whether the petitioner has been abused, and whether the petitioner has been abused is an issue of fact that must be proven by a preponderance of the evidence. *Best v. Best*, 223 Ill. 2d 342, 348 (2006). This court will only reverse a circuit court's grant of an order of protection if it is against the manifest weight of the evidence. *Id*. at 348-49. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002). Further, under the manifest weight standard, this court gives deference to the circuit court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id*. at 498-99.

16

¶ 39 Here, the circuit court stated that it had considered the verified petition, testimony of all witnesses, exhibits, and the arguments presented by both parties. The record of proceedings demonstrates that the respondent's counsel questioned the petitioner regarding the inconsistences in her prior statements and/or testimony regarding the manner in which the event occurred. The petitioner was also questioned regarding the inconsistencies pertaining to her injuries and was further challenged by the respondent's counsel regarding her medical records. Inconsistencies in statements and/or testimony taken at different times are not unusual and go to the weight to be given to the testimony by the trier of fact, but do not destroy the credibility of the witness. *People v. Henderson*, 36 Ill. App. 3d 355, 368 (1976). Any inconsistencies in the petitioner's testimony at the hearing with her prior statements and/or testimony was brought to the attention of the circuit court, and the circuit court, as the trier of fact, determined the weight to be given to the petitioner's testimony and any inferences thereto. This court will not substitute its judgment for that of the circuit court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn. *In re D.F.*, 201 Ill. 2d at 499. Although there were inconsistencies in the petitioner's testimony, the circuit court found that the petitioner's testimony, taken in its entirety, was sufficient to demonstrate that the abuse allegations were more likely true than not. That conclusion was neither unreasonable nor arbitrary, and we do not find that the opposite conclusion was clearly evident.

¶ 40 Next, the respondent states that the circuit court did not consider his statement to law enforcement. The respondent's statement was contained in respondent's exhibit 15 and the circuit court indicated that it had considered all exhibits. The respondent does not direct this court to any portion of the record in support of his contention that the respondent's statement to law enforcement was not considered by the circuit court. Further, the respondent's counsel examined

the petitioner regarding whether or not her injuries resulted from a fall from the side-by-side, which is what the respondent alleged in his statement. Thus, we find that the respondent's contention that the circuit court failed to consider his statement to law enforcement to be meritless.

¶ 41 Finally, the respondent argues that the uncontroverted testimony of the respondent's witnesses proved that the respondent was not around the petitioner "several minutes" before the 911 was made to the Massac County Sheriff's Office. The respondent's witnesses established that the respondent arrived at an unknown time at the Faiths' residence, and that a call was made to Glenn Faith at 9 p.m., which was 17 minutes prior to the 911 call. The respondent's witnesses further established that the respondent had a black eye and that it would take 20 to 25 minutes for the respondent to drive to the Faiths' residence.

¶ 42 None of the respondent's witnesses had personal knowledge of the events that occurred between the respondent and the petitioner on March 17, 2022. The witnesses' testimony only established the respondent's arrival at the Faiths' residence and what the respondent had stated had occurred between himself and the petitioner. At most, the respondent's witnesses' testimonies may have called into question the timeline of events, but none of the respondent's witnesses established that the respondent could not have inflicted the alleged abuse.

¶ 43 The circuit court, having considered the verified petition, testimony of all witnesses, exhibits, and the arguments presented by both parties, determined by a preponderance of the evidence that the petitioner had been abused by the respondent. We do not find that the opposite conclusion is clearly evident or that the finding itself is unreasonable, arbitrary, or not based on the evidence presented. The circuit court was in the best position to observe the conduct and demeanor of the parties and witnesses, and on the central issue of whether the petitioner was abused by the respondent, the circuit court found the petitioner's statements and testimony, when

18

viewed in their entity, were sufficient to make the petitioner's abuse allegations more likely true than not. Thus, we find that the circuit court's grant of the OP was not against the manifest weight of the evidence.

¶ 44 The respondent next argues that the circuit court's findings did not meet the standards of section 214(c)(3) of the Act (750 ILCS 60/214(c)(3) (West 2022)). The respondent notes that the circuit court checked both boxes indicating that its findings were stated on "page 11 and 12 of this *Order*, OR" and "[w]ere made orally and videotaped or recorded by a court reporter and are incorporated into this *Order*." (Italics in original.) The respondent argues; however, that the circuit court took the matter under advisement and made no oral findings at the conclusion of the hearing. The respondent also states that circuit court's docket entry of January 23, 2023, and the circuit court's findings within paragraph 7 of the OP, since it omitted the word "prohibited," failed to meet the requirements of section 214(c)(3) of the Act (*id*.).

¶ 45 Section 214(c)(3) of the Act requires the circuit court to make its findings in an official record or in writing, and set forth, at a minimum, the following:

"(i) That the court has considered the applicable relevant factors described in paragraphs (1) and (2) of this subsection.

(ii) Whether the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse.

(iii) Whether it is necessary to grant the requested relief in order to protect petitioner or other alleged abused persons." *Id*.

¶ 46 Paragraph (1) of subsection (c) requires the circuit court, in determining whether to grant a specific remedy, to consider the following relevant factors:

19

"(i) the nature, frequency, severity, pattern and consequences of the respondent's past abuse, neglect or exploitation of the petitioner *** and the likelihood of danger of future abuse, neglect, or exploitation to petitioner or any member of petitioner's or respondent's family or household[.]" *Id.* § 214(c)(1)(i).

¶ 47    The respondent cites to this court's decision in *Landmann v. Landmann*, 2019 IL App (5th) 180137, in support of his argument that the circuit court's "pre-printed findings" did not meet the above statutory standards. In *Landmann*, this court reversed a circuit court's entry of an order of protection where the record failed to demonstrate that the circuit court had made findings regarding the relevant factors contained in section 214(c)(3)(i). *Id.* ¶ 19. This court further expressed concerns that the preprinted form relied upon by the circuit court may have been inadequate to comply with the statutory mandates. *Id*.

¶ 48    We note that *Landmann* was decided prior to the Illinois Supreme Court's approval of form OP-P 405.3. As such, our concern regarding the preprinted form used by the circuit court in *Landmann* was not in regard to form OP-P 405.3, which was used by the circuit court in the matter at bar. Further, the circuit court in *Landmann* failed to make any findings required by section 214(c)(3)(i), whereas in this matter, the circuit court failed to insert a single word.

¶ 49    We will reverse a circuit court's entry of an order of protection if it fails to make the required findings. *People ex rel. Minteer v. Kozin*, 297 Ill. App. 3d 1038, 1043 (1998). In this matter, however, the circuit court's findings within the OP clearly stated that the circuit court had considered all of the above statutory factors. Although paragraph 7 contained an incomplete sentence due to the missing word "prohibited," paragraph 5 did contain the complete finding that "The actions of Respondent will likely cause irreparable harm or continued abuse unless they are

prohibited." Thus, the circuit court made the findings required by sections 214(c)(1) and 214(c)(3) in its written OP order.

¶ 50    The respondent also argues that the circuit court's docket entry of January 23, 2023, did not meet the required standards of section 214(c)(1). Section 214(c)(3) of the Act only requires the circuit court to make its findings in an official record or in writing. The respondent cites no statutory law or precedent that would require a circuit court to address the relevant factors within a docket entry that indicated a written order would be forthcoming. The respondent also states that the circuit court did not make an oral record of its ruling although it checked both boxes indicating that its findings were stated within the written order and were orally recorded by a court reporter and incorporated into the written order. The respondent does not state how this error effected the OP or how it somehow failed to comply with section 214(c)(3).

¶ 51    Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) states that an appellant's argument "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Accordingly, this court is entitled to have the issue clearly defined with a cohesive argument presented and pertinent citations to legal authority. *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). As such, we find that the respondent's failure to support, with citation to legal authority or a coherent argument, forfeits review on appeal of his contention that the circuit court's docket entry was required to comply with section 214(c)(3) and his contention regarding the circuit court's error in checking the box indicating that it had made oral findings. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020); *People v. Sprind*, 403 Ill. App. 3d 772, 779 (2010).

¶ 52    We find that the circuit court determined, by a preponderance of the evidence, that the petitioner had been abused by the respondent and that such finding was not against the manifest

weight of the evidence. We further find that the record demonstrates that the circuit court made its finding in writing, and stated that the circuit court had considered, at a minimum, the required statutory relevant factors set forth in sections 214(c)(1) and 214(c)(3) of the Act.

¶ 53                              III. CONCLUSION

¶ 54    Based on the above, we affirm the judgment of the circuit court of Massac County granting a plenary order of protection.


¶ 55    Affirmed.